STATE of South Dakota, Plaintiff
and Appellant,

v.

Frank WEST, Defendant and
Respondent.

No. 11874.

Supreme Court of South Dakota.

Nov. 30, 1977.

216

Thomas J. Welk, Asst. Atty. Gen., Pierre, for plaintiff and appellant; William J. Janklow, Atty. Gen., Pierre, on brief.

1. ABP Vice president of Finance.

2. ABP check signator at Council Bluff's plant.

Harvey C. Jewett of Siegel, Barnett, Schutz, O'Keefe, Ogborn & Jewett, Aberdeen, James P. Linn of Linn, Helms, Kirk & Burkett, Oklahoma City, Okl., for defendant and respondent.

ZASTROW, Justice.

This is an appeal by the state (pursuant to SDCL 23–51–2(2)) from the trial court's order granting the defendant's motion to compel the election of counts and the defendant's motion to dismiss all charges based upon a former judgment of acquittal. We affirm in part and reverse in part.

The defendant, Frank West (West), was president of American Beef Packers, Inc. (ABP), once the second largest packing company in the United States with assets of over $100,000,000 on June 30, 1974; by January 7, 1975, ABP, because of financial setbacks, had filed for a chapter XI bankruptcy. The bankruptcy was caused by an inability of ABP to obtain the long-term financing necessary for the construction costs of a new packing plant in Dumas, Texas. As the result of the lack of operating funds and the filing of the bankruptcy, a large number of producers in thirteen midwestern and western states were unpaid for over $20,000,000 worth of livestock shipped to ABP's six slaughter houses.

One of these producers was Dalton Docter (Docter) of Amherst, South Dakota. As a result of eleven separate sales of cattle by Docter to ABP between December 19, 1974 and January 4, 1975, criminal charges were filed against West, Tom Clark,[1] W. G. Myers,[2] and Myron Ousley.[3] The charges against Clark, Myers and Ousley were ultimately dismissed, and they were granted immunity by the state in return for their testimony against West. After the dismissal of several alternative counts by the state, West stood charged with four counts of grand larceny, four counts of obtaining property by false pretenses, and seven counts of issuing a large check against insufficient funds.

3. ABP cattle buyer assigned to South Dakota.

West and ABP were also indicted by a federal grand jury in the United States District Court in Omaha, Nebraska, charging them in one hundred five counts with violations of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 2314 (interstate transportation of stolen property), § 371 (conspiracy), and § 2 (aiding and abetting). These federal charges will be discussed in more detail later in the opinion.

The complicated financial problems of ABP which led to the bankruptcy and these criminal charges are outlined in the decisions of *United States v. West*, D.C.Neb., 407 F.Supp. 1148, and *United States v. West*, 8 Cir., 549 F.2d 545. The financial difficulties of this multimillion dollar business led West, ABP and several of its employees to become involved in an elaborate bookkeeping scheme which allowed ABP to divert funds belonging to its primary financial backer General Electric Credit Corporation (GECC). This scheme had been in operation since December 1973, and was not discovered by GECC's auditors until December 16, 1974, when the diversion had reached over $5,000,000. The discovery of this diversion led to a substantial disagreement between ABP and GECC over the daily loans it made to ABP to cover checks issued by ABP for the purchase of livestock. After several days of financial difficulties and GECC's refusal to make a $15,000,000 loan, ABP was unable to provide sufficient funds to cover all of the checks presented to its various banking accounts, principally the Seattle First National Bank (Seattle Bank) and the Wachovia Bank and Trust Company (Wachovia Bank) of Winston-Salem, North Carolina. On January 3, 1975, after covering checks to the extent of the funds available, these banks began returning checks presented for payment for insufficient funds. The ABP plants were advised by the corporate officers to delay sending any checks still in their possession. More checks were returned by the banks on the next business day, January 6, 1975. ABP finally stopped issuing checks on January 6, and on January 7 filed for a chapter XI bankruptcy in the United States District Court in Omaha, Nebraska.

To present the facts in chronological order, we begin with count IX of the state's information. Count IX, as do counts X through XV, charged that West, with the intent to defraud, drew checks against a bank account with insufficient funds for the payment of the checks, in violation of SDCL 22–41–1.1.

Count IX specifically involves the purchase by ABP cattle buyer Loren Lorenzen of 233 head of livestock from Docter on December 19, 1974. The cattle were shipped to the ABP plant in Oakland, Iowa, and were slaughtered on December 21, 1974. Because the final price was based upon the grade and yield of the carcass, the check in the amount of $86,807.29 was not drawn on the ABP account at the Seattle Bank and mailed to Docter until December 21, 1974. This check was deposited at the Britton Branch of the First National Bank of Aberdeen (Britton Branch Bank) on December 30, 1974. It was among the many checks returned by the Seattle Bank after January 3, 1975.

Counts X and XI of the information involve the purchase by ABP buyer Myron Ousley of 36 heifers and 9 steers from Docter on December 26, 1974, which were slaughtered on December 28, 1974. Two checks were drawn for $11,785.76 and $3,050.31 on the Wachovia Bank and mailed to Docter on December 28. A third check, on the same bank, for $405.33 was drawn and mailed on December 31. These three checks were deposited at the Britton Branch Bank on January 6, 1975, and, ultimately, returned for insufficient funds about January 16.

Count XII involves the purchase by Ousley on December 30, 1974, of 4 heifers from Docter which were slaughtered on December 31, and a check in the amount of $1,292.32 was drawn on the Wachovia Bank. It was presented for payment and ultimately returned for insufficient funds about January 17. Count XIII involves Ousley's purchase on December 28, 1974, of 33 heifers for which a $12,230.17 check was issued by ABP on December 31, 1974. Presenta-

tion for payment was refused and the check was returned for insufficient funds by the Wachovia Bank on January 20, 1975. Counts XIV and XV involve two sales by Docter to ABP of 48 animals each for which checks were issued on January 2, 1975, drawn on the Wachovia Bank, one for $17,-013.16 (count XIV), and the other for $15,-614.09 (count XV). These checks were returned on January 17, 1975, by the Wachovia Bank for insufficient funds.

Counts I through IV of the information charge West with grand larceny by fraud in violation of SDCL 22–37–1 and 22–37–2. Counts V through VIII allege that at the same time, West violated SDCL 22–41–4 by obtaining property, i. e., livestock, by false pretenses. The testimony at the preliminary hearing indicated that on January 2, 1975, Myron Ousley contacted Jack Edmundson, one of the two main cattle buyers for ABP at Omaha, and was advised to make purchases of cattle for ABP. Ousley then contacted Docter's feedlot manager and arranged for the purchase of three loads of cattle consisting of 39 steers, 29 heifers and 184 steers. The shipment of 39 steers went to the Council Bluffs plant of ABP where they were slaughtered on January 3. Counts I and V of the information are based upon this shipment. The other two shipments went to the Oakland, Iowa plant where they were slaughtered on January 3. Counts II and VI are based upon the shipment of 29 heifers and counts III and VII upon the shipment of 184 steers. On January 4, 1975, Ousley similarly purchased 40 steers which were slaughtered at Council Bluffs, Iowa, on January 6, 1975. Counts IV and VIII are based upon this shipment. The value of the shipments was estimated at $12,750, $9,021, $68,874 and $15,375, respectively. Payment for these cattle was never received by Docter.

Turning to the federal indictment, count XVI thereof alleged that on or about January 3, 1975, West and ABP, for the purposes of carrying out the scheme to defraud the livestock producers, transmitted a telephone communication between ABP in Omaha, Nebraska, and Myron Ousley in Yankton, South Dakota. This count was based upon the "buy order" from Jack Edmundson to Myron Ousley which led to the purchases alleged in counts I through VIII of the state's information.

Count XVII of the federal indictment alleges that West and ABP "did transport and cause to be transported in interstate commerce from Amherst, South Dakota * * * to Council Bluffs, Iowa * * * and passed through the State of Nebraska on Highway 73 * * * livestock, of the value of $5,000.00 or more, knowing the same to have been stolen, converted and taken by fraud * * *." Count XVII of the federal indictment refers to the same shipment of 39 steers referred to in the state's information in counts I and V.

Count XVIII of the federal indictment alleges that West and ABP "did transport and cause to be transported in interstate commerce from Amherst, South Dakota * * * to Oakland, Iowa * * * and passed through the State of Nebraska on Highway 73 * * * livestock, of the value of $5,000.00 or more, knowing the same to have been stolen, converted and taken by fraud * * *." This particular transaction refers either to the 29 heifers referred to in the state's information (counts II and VI) or the 184 steers alleged in the state's information (counts III and VII).

Count XIX of the federal indictment alleges that ABP and West "did transport and cause to be transported in interstate commerce from Dalton Docter, Amherst, South Dakota * * * to Oakland, Iowa * * * and passed through the State of Nebraska on Highway 73 * * * livestock, of the value of $5,000.00 or more, knowing the same to have been stolen, converted and taken by fraud * * *." Again, this refers to the transactions alleged in counts II and VI, or counts III and VII of the state's information.

Count XX of the federal indictment alleges that "[on] or about January 6, 1975," ABP and West "did transport and cause to be transported in interstate commerce from Dalton Docter, Amherst, South Dakota * * to Council Bluffs, Iowa * * * and

passed through the State of Nebraska on Highway 73 * * * livestock, of the value of $5,000.00 or more, knowing the same to have been stolen, converted and taken by fraud * * *." This allegation has reference to the same transaction alleged in the state's information, counts IV and VIII.

While the present state charges were pending, West moved the trial court for a continuance, which was granted, pending his trial on the federal indictment. As a result of the trial in the Federal District Court in Omaha, Nebraska, West was acquitted of eighty-one counts and found guilty of twenty-four counts of the indictment. West then moved the state trial court for a dismissal of the state charges on the grounds of a former acquittal under the authority of the Fifth and Fourteenth Amendments of the United States Constitution, and Art. VI, §§ 2, 9, of the South Dakota Constitution, and also SDCL 22–5–8. The basis of the motion was the acquittal of West in the federal district court of counts I, XVI, XVII, XVIII, XIX and XX of the federal indictment. The trial court denied the motion to dismiss based upon double jeopardy under the constitutional provisions but did grant the motion to dismiss based upon the provisions of SDCL 22–5–8.

## DOUBLE JEOPARDY

### Constitutional Provisions

█ Our analysis of the state's appeal must begin with an understanding of the extent of the double jeopardy provisions of the Fifth Amendment of the United States Constitution (as applied to the states by the Fourteenth Amendment)[4] and Art. VI, § 9 of the South Dakota Constitution. It clearly appears that the same act or transaction may constitute a violation of both federal and state laws, and a conviction or acquittal in one jurisdiction will not prevent a subsequent prosecution in the other if the criminal act is one over which both sovereignties have jurisdiction in the absence of a statute to the contrary. Such a subsequent state prosecution based upon the same act or transaction for which the accused had previously been convicted has been held to violate neither the double jeopardy provision of the Fifth Amendment nor the due process clause of the Fourteenth Amendment, *Bartkus v. Illinois,* 1959, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684; *Abbate v. United States,* 1959, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729; *Screws v. United States,* 1945, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, nor state constitutional provisions similar to Art. VI, § 9 of the South Dakota Constitution, see generally, 21 Am.Jur.2d, Criminal Law, § 192; 22 C.J.S. Criminal Law § 296(d); Annots., 18 A.L.R.Fed. 393, 48 A.L.R. 1106, 22 A.L.R. 1551, 16 A.L.R. 1231; 1 Wharton's Criminal Law § 146; 3 Wharton's Criminal Evidence § 661.

A review of these authorities (and many others cited therein) leads to the conclusion that the "dual sovereign" concept, although criticized by Justice Brennan in his dissent in *Bartkus v. Illinois,* supra, remains the constitutional law in all jurisdictions of the United States.[5] We can perceive no necessity of construing our state constitutional provisions in a different fashion. Likewise, it is clearly established that collateral estoppel and res judicata, although applicable to successive prosecutions for the same criminal act by the same sovereign (see *Ashe v. Swenson,* 1970, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469) are not applicable to successive prosecutions by different sovereigns. See, Annot., 9 A.L.R.3d 203. We agree with the trial court's original ruling that

4. *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656; *Benton v. Maryland,* 1969, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707; *Waller v. Florida,* 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435.

5. We do note, however, that while the double jeopardy provision allows "dual sovereign" prosecutions, it may not in the same situations allow for imposition of "dual sovereign" punishment following such prosecutions. *Commonwealth v. Mills,* 447 Pa. 163, 286 A.2d 638; *Epps v. Commonwealth,* 216 Va. 150, 216 S.E.2d 64; *United States v. Crawford,* 10 Cir., 466 F.2d 1155; *United States v. Candelaria,* D.C.Cal., 131 F.Supp. 797; *United States v. Palan,* Cir.Ct.N.Y., 167 F. 991; *United States v. Peterson,* D.C.Wash., 268 F. 864.

neither the Fifth and Fourteenth Amendments of the United States Constitution nor Art. VI, § 9 of the South Dakota Constitution would bar the prosecution of West on the state charges.

### Statutory Provisions

Although the constitutional protections against double jeopardy do not prevent "dual sovereign" prosecutions for the same act, a state may, by statute, place greater restrictions upon multiple prosecutions. *Bartkus v. Illinois,* supra; *United States v. Lanza,* 1922, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314. The South Dakota legislature has provided a stricter standard on multiple prosecutions by "dual sovereigns" in what is now codified as SDCL 22–5–8:

> "Whenever it appears that the accused has already been acquitted or convicted upon any criminal prosecution under the laws of another state, government, or country *founded upon the act or omission* in respect to which he is upon trial, this is a sufficient defense." (emphasis supplied)

and SDCL 23–2–13 which states in part:

> "When an act charged as a public offense is within the jurisdiction of another territory, state, or country as well as this state, a conviction of acquittal thereof in the former is a bar to a prosecution therefor in this state. * * * "

Although these statutes have remained unchanged since territorial days, no decision of this court has interpreted these statutes nor their predecessors. The statutes are, however, substantially similar to those of New York,[6] California,[7] Oklahoma,[8] and Arizona,[9] and we look to the interpretation of their statutes to assist in the interpretation of SDCL 22–5–8 and SDCL 23–2–13 (see 82 C.J.S. Statutes § 373). We also consider

this court's previous interpretation of SDCL 23–2–12 in *State v. Pickering,* 1975, S.D., 225 N.W.2d 98, governing successive state prosecutions to determine the meaning of SDCL 22–5–8 and SDCL 23–2–13, which apply to successive dual sovereign prosecutions. In *Pickering,* this court rejected the so-called "same transaction test" of double jeopardy and adopted the "same evidence test" for application of our state's double jeopardy standards, both constitutional and statutory. It is reasonable to assume that the provisions of SDCL 22–5–8 and SDCL 23–2–13 were intended to be applied to state prosecutions after a "foreign prosecution" in the same fashion as SDCL 23–2–12 and Art. VI, § 9 of the South Dakota Constitution applied to successive state prosecutions.

The "same evidence" interpretation of their statutes was adopted by the California and Arizona courts in *People v. Candelaria,* 1957, 153 Cal.App.2d 879, 315 P.2d 386; *People v. Belcher,* 11 Cal.3d 91, 113 Cal. Rptr. 1, 520 P.2d 385; and *Henderson v. State,* 1926, 30 Ariz. 113, 244 P. 1020, respectively. Oklahoma has applied the words of the statute, i. e., same "act or omission" to determine whether there is double jeopardy. See *La Forge v. State,* 1924, 28 Okl.Cr. 37, 228 P. 1111; *State v. Mills,* 82 Okl.Cr. 155, 163 P.2d 558, rehearing granted, 167 P.2d 669; and *Perry v. Harper,* Okl.Cr., 307 P.2d 168. However, in each of those cases the federal charges and the state charges appear to be substantially identical.[10] New York has also found its statutes bar a state prosecution following a conviction or acquittal in federal courts, *People v. Lo Cicero,* 1964, 14 N.Y.2d 374, 251 N.Y.S.2d 953, 200 N.E.2d 622; *People v. Mangano,* 1945, 269 A.D. 954, 57 N.Y.S.2d

**6.** McKinney's Consolidated Laws of New York, Annot., Criminal Procedure Law, §§ 40.20, 40.-30(1). The New York statute was changed in 1970 to broaden the definition of double jeopardy. See *Abraham v. Justices of N. Y. Supreme Ct., Bronx Cty.,* 37 N.Y.2d 560, 376 N.Y.S.2d 79, 338 N.E.2d 597.

**7.** Cal.Penal Code § 656.

**8.** 21 O.S. § 25.

**9.** ARS, 13–146.

**10.** Illegal possession of liquor in *La Forge;* manslaughter, the state charge, and killing while driving in a grossly negligent manner, the federal charge, in *Mills;* and driving a motor vehicle under the influence of intoxicating liquor, the state charge, and driving a vehicle while intoxicated, the federal charge in *Perry.*

891; *People v. Parker,* 1941, 175 Misc. 776, 25 N.Y.S.2d 247, where there is "substantially identity of the two charges," and the state charges "are legally constituent elements of the (federal crime)" and "factually refer to the same acts that formed the basis of the federal (charge)." We do not interpret those cases as being contrary to the "same evidence test" used by California and Arizona to determine whether the "act(s) or omission(s)" which were the basis of the foreign conviction or acquittal are the same as the one for which the defendant may be on trial.

The "same evidence test," as announced by this court in *Pickering,* is:

"* * * that the plea of double jeopardy is available only when the separate offenses are *in substance the same,* so that the evidence which proves the one would prove the other and *if an essential element* of one is not necessarily present in the other there is no former jeopardy." 225 N.W.2d at 101. (emphasis supplied)

See also 21 Am.Jur.2d, Criminal Law, § 182; 22 C.J.S. Criminal Law § 279.

■ The emphasized portions of that rule become important when comparing the elements of the crimes charged, for seldom will the language of the state or federal statutes be identical to South Dakota statutes. Therefore, the same evidence test requires this court to look to the "substance" of the offenses and to determine whether the "essential elements" are to be proved by the same evidence. In determining whether the elements are substantially the same, the court should take into consideration the respective purposes of the statutes as they relate to the particular course of conduct of the defendant.

■ However, differences in the two crimes consisting only of elements necessary to establish the subject matter jurisdiction of the foreign court will not be considered in determining whether the offenses have substantially similar essential elements. This is so because jurisdictional elements of crimes usually require proof of a status, and not an additional act by the defendant. *People v. Belcher, supra; People v. Candelaria, supra; People v. Lo Cicero, supra.*

Before analyzing the charges which the defendant purports to be double jeopardy, we first must deal with the state's assertion that the issue of double jeopardy should have been decided by the jury [11] and not by the trial court. That issue was raised and ruled upon by this court in *State v. Pickering,* supra:

"Traditionally this Court has held that a plea of former acquittal is an affirmative defense to be pled and as a result is not to be considered in a demurrer. *State v. Magnuson,* 1925, 48 S.D. 112, 202 N.W. 638. The *Magnuson* case, supra, together with the case of *State v. Kieffer,* 1903, 17 S.D. 67, 95 N.W. 289, have held that since a plea of former jeopardy is an affirmative defense, it presents an issue which should be submitted to the jury.

"In the instant case, however, there seems to be no question of fact for the jury to determine, since there seems to be no question as to the date of the alleged offense, the identity of the property in question or the identity of the defendant. It would therefore appear that the question as to whether or not the defendant had once been placed in jeopardy was completely a question of law to be determined by the court."

As in *Pickering,* there appears to be no factual question in dispute for a resolution of the double jeopardy question concerning the grand larceny by fraud charges in counts I through IV, the obtaining of property by false pretense of counts V through VIII of the state's information, and the interstate transportation of stolen property alleged in counts XVII through XX of the federal indictment. As suggested earlier in this opinion, each of the state and federal charges alleges that on or about the dates of January 2, 3, or 4, 1975, the defendant, Frank West, transported livestock belong-

11. SDCL 23–44–19 provides: "Issues of fact must be tried by a jury. An issue of fact arises: * * * (2) Upon a plea of a former conviction or acquittal of the same offense."

ing to Dalton Docter which had been obtained by fraud or false pretenses.

There is no question as to the dates of the offenses, the identity of the property (i. e., livestock), the identity of the defendant, that the defendant's acts were as an aider and abettor, that the livestock were carried by trucks passing from South Dakota through Nebraska on the way to ABP plants in Iowa, and that the fraud and false pretenses used were the promise to pay for the livestock when West knew or should have known that ABP would not have the funds to pay for the livestock.

However, the state argues that in the federal indictment count XVI alleged that West had used wire communications to the ABP cattle buyer in securing the livestock from Docter, which were then transported in interstate commerce. This the state contends was an essential element necessary to prove the federal offense of interstate transportation of stolen property—evidence of which (and an element) the state contends it would not have to prove in its prosecution of West for grand larceny or of obtaining property by false pretense.[12]

■ The state's argument fails for three reasons: (1) Count XVI of the federal indictment alleges a distinct crime of illegal communication. Failure of proof of count XVI of the federal indictment would not have been fatal to proof of the charge of interstate transportation of stolen property alleged in counts XVIII–XX; (2) The reason that West was acquitted of counts XVI through XX of the federal indictment was because the federal court found that there

was no intent to defraud on West's part, not because the particular acts did not occur; (3) Even if the wire communication had an essential element of the interstate transportation charge, the state to establish that West aided and abetted in the grand larceny by fraud or obtaining property by false pretenses must prove that West "aid(ed), promote(d), encourage(d) or instigate(d) by act or advice the commission of such crime." See South Dakota Pattern Jury Instruction 1–13. At the preliminary hearing, the "buy order" from the ABP office to its South Dakota representative was the only link between West and Docter's shipment of the cattle. Its proof would be essential to establish that West "aided and abetted" in the alleged criminal conduct in South Dakota.

■ The state also contends that the transportation of the livestock in interstate commerce was an essential element of the federal charges which would not be a necessary proof in the state prosecution. Again, the state's position is incorrect for two reasons: (1) the passing of the property obtained by fraud through interstate commerce was necessary only to establish federal jurisdiction, and, as such, is not an element which is determinative of double jeopardy under SDCL 22–5–8 and SDCL 23–2–13,[13] *People v. Candelaria,* supra; *People v. Belcher,* supra; and *People v. Lo Cicero,* supra; (2) even if it were an essential element, the state in this case must offer proof of the "taking" or "obtaining" of Docter's property, and the proof of that element could only be the act of transporting the livestock in interstate commerce.

---

**12.** SDCL 22–37–1: "Larceny is the taking of personal property accomplished by fraud or stealth and with intent to deprive another thereof."

SDCL 22–37–2: "Grand larceny is larceny committed in any of the following cases: (1) When the property taken is of a value exceeding fifty dollars * * * (3) When such property is livestock." SDCL 22–41–4: "Every person who designedly, by color or aid of any * * other false pretense * * * obtains from any person any money or property * * * is punishable by imprisonment in the state penitentiary not exceeding three years or in a county jail not exceeding one year, or by a fine not

exceeding three times the value of the money or property so obtained, or by both such fine and imprisonment."

18 U.S.C. § 2314: "*Whoever transports in interstate or foreign commerce any goods,* wares, merchandise, securities or money, *of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud * * .*" (emphasis supplied)

**13.** The requirement that the property have a value of $5,000 or more under 18 U.S.C. § 2314 would likewise appear to be a jurisdictional element, and not a substantial element of the crime.

Although not controlling, we find support in the federal court's interpretation that the purpose of 18 U.S.C. § 2314 is to implement federal-state cooperation in apprehending and punishing criminals (*Cooper v. North Jersey Trust Company of Ridgewood, N. J.,* 1964, D.C.N.Y., 226 F.Supp. 972) who utilize, or cause to be utilized, the channels of interstate commerce (*United States v. Sheridan,* 1946, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359) for the transportation of goods of which the owner has been wrongfully deprived (*Lyda v. United States,* 1960, 5 Cir., 279 F.2d 461). We feel that the respective purposes of SDCL 22–37–1, SDCL 22–41–4 and 18 U.S.C. § 2314, as they relate to the particular course of conduct of the defendant, are essentially and substantially the same, i. e., to prevent the owner of property from being deprived thereof by false or fraudulent pretenses, promises or representations.

Furthermore, with the exception of the jurisdictional elements of interstate transportation and value, the essential elements of each of the offenses, i. e., (1) the aiding and abetting, (2) the taking of property, (3) belonging to Docter, (4) by fraud or false pretense, would all be legally constituent elements of the federal charges and would be proven by the same evidence in the state court as in the federal court.

For these reasons, we affirm the dismissal of counts I through VIII of the state's information as being barred by the statutory double jeopardy provisions of SDCL 22–5–8 and SDCL 23–2–13.[14]

Application of the same evidence test to counts IX through XVI of the state's information is substantially more difficult. Each count alleges a separate violation of SDCL 22–41–1.1, the pertinent parts being:

"Any person * * * as [a] member of a * * * corporation who shall for present consideration, willfully, *with intent to defraud,* make, draw, utter or deliver a check in an amount of one hundred dollars or more * * * for the payment of money upon any bank * * * *knowing at the time of such making, drawing, uttering or delivering,* that the maker or drawer has not sufficient funds in such bank * * * for the payment of such check * * * and all other checks, drafts or orders upon such funds then outstanding, in full upon presentation * * *." (emphasis supplied)

As with the larceny counts, West's responsibility for these charges can only be as an aider and abettor, for the preliminary hearing evidence clearly shows that West did not personally make, draw, utter, or deliver any of the checks introduced as evidence. Any acquittal of the federal charges which would bar the prosecution must be found in count I of the federal indictment. Count I, charging West with aiding and abetting a wire communications fraud under 18 U.S.C. § 1343,[15] consisting of twelve pages and containing thirty-eight paragraphs of alleged acts, alleges that one of the persons defrauded was Dalton Docter, Amherst, South Dakota, in the amount of $259,217.94. Acts pertinent to the state offenses alleged in the federal indictment as part of the scheme or artifice were: (1) establishing bank accounts at the Wachovia Bank and Seattle Bank in October and November of 1974, to extend the time within which their checks would be presented for payment; (2) discussing at a board of directors meeting on December 31, 1974, the advantages of filing a chapter XI bankruptcy and ordering envelopes for that purpose; (3) ordering the Wachovia Bank and the Seattle Bank on January 3, 1975, not to honor previously written checks while on

14. In light of this ruling, it is unnecessary to determine the propriety of the trial court's order for the state to elect between counts I through IV and counts V through VIII.

15. 18 U.S.C. § 1343: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

the same date and on January 7, 1975, issuing certified checks to preferred creditors; (4) that between January 3 and January 6, 1975, cattle were ordered and checks issued knowing that the checks would not be honored; (5) filing for a chapter XI bankruptcy on January 7, 1975.

There is no transcript of the trial in federal district court in the settled record, and we do not know what evidence was introduced concerning the Docter property listed in count I. Likewise, the acts by which Docter was allegedly defrauded of $259,-217.94 are not set forth in detail in count I.[16] We do know, however, that Judge Denney found that the acts between December 31, 1974 and January 7, 1975, were not a "planned bankruptcy" which would have constituted a scheme or artifice to defraud. *United States v. West,* 407 F.Supp. at 1164-1165. This, the defendant argues, is sufficient to show an acquittal for the same transaction charged in the federal indictment as West now stands charged in counts IX through XVI of the state's information.

Count I of the federal indictment charges in essence a scheme between West and others for a "planned bankruptcy," beginning December 31, 1974 and ending January 7, 1975. In the federal indictment, the allegations of issuing checks, knowing that they would not be honored, pertain to the period of January 3 through January 6, 1975. In the state's information, the checks for which West is charged were written between December 21, 1974 through January 2, 1975.

 As we read the transcripts of the preliminary hearing and the hearing on the defendant's motions, the state intends to show West's "intent to defraud" (which must exist at the time the checks were drawn, uttered or delivered) by evidence of a planned bankruptcy. The implication is that the state can show evidence of a plan to file for bankruptcy to defraud the payees of its checks which began on or prior to December 21, 1974. Such evidence would

not be proof of the same acts charged in the federal indictment and presented to the federal court, see *United States v. West,* 407 F.Supp. at 1164, which show that the plans for bankruptcy did not begin until December 31, 1974. The state should have been given the opportunity to present its evidence in support of its charge.

We recognize that had the state's prosecution not been continued and the defendant had been convicted or acquitted in state court, the federal prosecution would not have been barred by the Fifth Amendment (since the federal code does not contain statutes similar to SDCL 22–5–8 and SDCL 23–2–13); however, we find the meaning and intent of our statutes as clearly applicable to prevent successive foreign jurisdiction—South Dakota prosecutions if the "same evidence test" is applicable.

The order of the court dismissing counts I through VIII is affirmed; the order dismissing counts IX through XVI is reversed and remanded for further proceedings.

DUNN, C. J., and WOLLMAN and PORTER, JJ., concur.

MORGAN, J., deeming himself disqualified from taking part in this decision, did not participate.

---

16. The creditors allegedly defrauded by the scheme were set forth in an appendix listing several hundred names and addresses and amounts, the total being in excess of $20,000,-000 apparently taken from the ABP bankruptcy petition's list of creditors.