2003 SD 93

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Pedro Garcia CHAVEZ a/k/a Alfredo Garcia Chavez, Defendant and Appellant.**

**No. 22438.**

Supreme Court of South Dakota.

Argued March 25, 2003.

Decided July 30, 2003.

Lawrence E. Long, Attorney General, Frank Geaghan, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Jeffery D. Collins, Barker, Wilson, Reynolds & Burke, Rapid City, South Dakota, and Kenneth R. Dewell, Viken, Viken, Pechota, Leach & Dewell, Rapid City, South Dakota, Attorneys for defendant and appellant.

ZINTER, Justice.

[¶ 1.] Alfredo Garcia Chavez was stopped by a South Dakota highway patrolman for a traffic violation. While stopped, the patrolman engaged Chavez in questioning and had his drug dog sniff the exterior of Chavez's vehicle. The dog allegedly alerted to the odor of illegal drugs. A search of the car revealed large quantities of marijuana, methamphetamine, and cocaine. Although drug charges were subsequently filed in federal district court, that court suppressed the evidence. After the federal charges were dismissed, the Lawrence County State's Attorney initiated state drug charges. The state circuit court subsequently conducted a suppression hearing in which the State introduced evidence that was not presented to the federal court. The state circuit court declined to suppress the evidence. Chavez was ultimately found guilty of two counts of possession of a controlled substance with intent to distribute and one count of possession of marijuana. Chavez appeals. We affirm.

### FACTS AND PROCEDURAL BACKGROUND

[¶ 2.] On September 30, 2000, Chavez's automobile was stopped by South Dakota Highway Patrolman Brian Swets. Although Chavez disputes the matter, Swets testified that he initiated the traffic stop because an object was hanging from the interior rear view mirror, which interfered with vision in violation of SDCL 32–15–6.[1]

[¶ 3.] There were three others in the vehicle: an adult male was in the front passenger seat, and an adult female and

---

1. SDCL 32–15–6 provides:
   It is a petty offense for any person to drive any vehicle upon a highway with any object or gadget dangling between the view of the driver and the windshield of the vehicle.

child were in the back seat. Swets testified that Chavez and the front seat passenger were extremely nervous. Swets indicated that Chavez's hand was "significantly, noticeably" trembling when he handed his driver's license to Swets. While conceding that most people who get pulled over react nervously to some extent, Swets stated that Chavez's nervousness "was out of the ordinary ... greater than I would expect to see."

[¶ 4.] In the course of checking Chavez's driver's license, Swets asked Chavez and the front seat passenger various general questions. In response, Chavez told Swets that Chavez was coming from Seattle, Washington and was traveling to North Carolina. Chavez also identified the male passenger as Aurelio Meja–Castillo. Swets testified that Meja–Castillo "had a jacket in his hands and was rolling it in his hands." Swets indicated that Meja–Castillo's nervousness was also "unusual both in length and degree." Swets indicated that "most people after the original stop, have relaxed, settled down some. Especially passengers, as they aren't usually the focus." Meja–Castillo, however, was "still nervous, agitated, rolling the jacket, very fidgety." Moreover, when asked, Meja–Castillo told Swets that he did not have a "green card." Based on this admission, Swets then asked Chavez if he had a "green card," and Chavez replied "no." Swets asked Chavez "[i]f I call INS to check, are you going to be here legally," and Chavez answered "no."

[¶ 5.] Before this license, registration and INS check were completed, Swets informed Chavez that Swets had a drug dog. Swets then stated, "so if I take my drug dog around the car, is he going to tell me there's drugs in the car." Chavez shrugged his shoulders and said "probably, if he's trained, probably but I don't think so." Swets then proceeded to have his dog (Crockett) sniff the exterior of the vehicle.

[¶ 6.] The officers on the scene contend, and the state court found, that Crockett "alerted" to the odor of an illegal drug coming from the vehicle. Swets testified that an alert occurred because he observed Crockett's sniff intensify, increase, and his body posture tightened. Swets stated that the dog "locked up on the trunk. He did not go any further." After the sniff, Swets told Trooper Michael Thomas that "Crockett showed some interest." Trooper Thomas[2] testified that he paid particular attention to Crockett's sniff of the vehicle because of Chavez's statement that the dog would probably alert to drugs in the vehicle. Thomas testified that the dog "sniffed a little bit more, stiffened up, and then [Swets] gave him a toy."[3]

[¶ 7.] After the dog sniff, the officers followed up on the occupants' immigration status. Meja–Castillo indicated that he did not have INS documentation or an immigrant card. Swets asked how he was able to get a drivers license without these documents. Meja–Castillo did not answer, but he did consent to the trooper looking though his wallet. While looking through the wallet, Swets discovered what appeared to be a counterfeit social security

---

2. Trooper Thomas's testimony was not presented at the federal suppression hearing. Thomas testified at the state hearing that he had worked with Swets and Crockett several times and had observed how Crockett reacted when he detected the odor of illegal drugs. In addition, Thomas had assisted Swets when Swets practiced and trained Crockett.

3. The evidence reflects that when Crockett alerts to the odor of illegal drugs, the officer gives the dog a toy. The arrest videotape does not show Chavez's vehicle, but it does show that when Crockett returned to the officer's car after sniffing the Chavez vehicle, Crockett had the toy in his mouth.

card. Furthermore, while still at the scene of the traffic stop, the border patrol put a hold on both Chavez and Meja–Castillo.

[¶ 8.] With the further assistance of Crockett, the officers subsequently searched the vehicle. During the search, they removed a back portion of the back seat and some carpet padding that disclosed an access panel. Once that panel was removed, the officers uncovered a hidden compartment containing several cellophane wrapped packages. Field tests yielded positive results for cocaine and methamphetamine. The vehicle was then towed to the Spearfish Police Department while officers obtained a search warrant. The ultimate search produced packages that contained 450.1 grams of methamphetamine, over four pounds of marijuana, and 18.6 pounds of "almost pure" cocaine.

[¶ 9.] Chavez's first criminal charges were initiated by indictment in United States federal district court. He was charged with: 1) knowingly and intentionally possessing with intent to distribute five kilograms or more of cocaine, and 2) knowingly and intentionally possessing with intent to distribute fifty grams or more of methamphetamine. Following a suppression hearing, a United States magistrate concluded that Chavez was unconstitutionally questioned about his alienage, and therefore, Chavez's answers should be suppressed along with all derivative evidence subsequently obtained. A United States district judge considered that decision and remanded the case to the magistrate for further findings on whether the dog actually alerted to the odor of illegal drugs during the initial sniff of the vehicle. On remand, the United States magistrate found that the dog did not alert to the odor of illegal drugs during the initial sniff of the vehicle. The United States district judge adopted the magistrate's findings

and recommendations, and suppressed all evidence from the vehicle. The United States government did not appeal that decision.

[¶ 10.] Upon dismissal of the federal criminal action, Chavez was indicted in state court on five drug counts. Chavez moved to suppress the evidence and to dismiss the case because of the evidence suppression and prior prosecution in federal court. Those motions were denied by Circuit Court Judge Timothy Johns. After a trial to the court, Judge Johns found Chavez guilty of possession of a controlled substance with intent to distribute and possession of marijuana.

[¶ 11.] Chavez appeals, raising these issues:

1. **Whether the trial court erred in denying Chavez's motion to suppress, and specifically:**

   A. **Whether there was a reasonable suspicion sufficient to stop Chavez's vehicle.**

   B. **Whether Chavez's constitutional rights were violated by the questioning about his alienage when the stop was for a traffic offense.**

   C. **Whether Chavez's *Miranda* rights were violated in the questioning about Chavez's alienage.**

   D. **Whether the drug dog alerted to the odor of illegal drugs during the sniff of Chavez's vehicle.**

2. **Whether the trial court erred in denying Chavez's motion to dismiss on grounds of collateral estoppel, res judicata, and double jeopardy.**

[¶ 12.] At the outset, we note that Chavez *does not* argue that the timing or the performance of the dog sniff during the traffic stop was unconstitutional. There-

fore, if the dog sniff provided probable cause for the auto search, we need not consider Issues 1B and 1C. We need not consider those issues because the challenged questioning in Issues 1B and 1C would not be necessary to prolong the stop or provide independent probable cause for the search.[4] Because we ultimately conclude that the drug dog alerted and provided probable cause, we do not reach Issues 1B or 1C. We affirm on Issues 1A (reasonable suspicion to stop), 1D (drug dog alert), and Issue 2 (double jeopardy/collateral estoppel/res judicata).

## STANDARD OF REVIEW

[¶ 13.] We recently reiterated the standard of review of a trial court's decision on a motion to suppress.

> A motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo. We review findings of fact under the clearly erroneous standard. Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo.

*State v. Hodges,* 2001 SD 93, ¶ 8, 631 N.W.2d 206, 209 (internal citations omitted).

## DECISION

[¶ 14.] **1A. Swets had a reasonable suspicion sufficient to stop Chavez's vehicle.**

[¶ 15.] The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures. Although this protection generally requires probable cause to search, "[t]he requisite level of suspicion necessary to effectuate the stop of a vehicle is not equivalent to probable cause necessary for an arrest or a search warrant." *State v. Barton,* 2001 SD 52, ¶ 13, 625 N.W.2d 275, 279. All that is required is that the police officer has "a reasonable suspicion to stop an automobile." *Id.* Therefore, the factual basis needed to support a traffic stop is minimal. *Id. State v. Sleep,* 1999 SD 19, ¶ 7, 590 N.W.2d 235, 238.

[¶ 16.] While the stop may not be the product of mere whim, caprice or idle curiosity, it is enough that the stop is based upon "specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *State v. Herrboldt,* 1999 SD 55, ¶ 7, 593 N.W.2d 805, 808 (quoting *Spenner v. City of Sioux Falls,* 1998 SD 56, ¶ 14, 580 N.W.2d 606, 611). Under these standards, it is well established that a traffic violation, however minor, creates sufficient cause to stop the driver of a vehicle. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95–96 (1996); *State v. Kenyon,* 2002 SD 111, ¶ 16, 651 N.W.2d 269, 274.

[¶ 17.] The trial court found that "based upon [Swets'] observation of the violation of SDCL 32–15–6 (object dangling from the rear view mirror), [he]

---

**4.** Chavez argues that if the dog did not alert and provide probable cause, the officers had no justification to expand the traffic stop into a complete search of his vehicle. Chavez raises a number of arguments contending that the evidence obtained through questioning should be suppressed under Issues 1B and 1C. Those contentions include: that the questioning concerning immigration status was unrelated to the objective purpose of the traffic stop; that the expansion of the scope of the stop was not permitted because Chavez and the passenger were not unusually nervous, did not tell conflicting stories about the purpose of the trip, and were not inconsistent about the passenger's residence; that the trooper should not have considered Seattle as a "source city" for illegal drugs; and, that Chavez's statements were obtained without required *Miranda* warnings.

initiated a traffic stop." Chavez has not established that this finding was clearly erroneous. We agree that the trooper had a specific and articulable suspicion of a traffic violation sufficient to justify the initial stop of Chavez's vehicle.

[¶ 18.] Chavez, however, argues the stop was pre-textual. He relies on a statement Swets made prior to the stop that "what the hell, I'm going to stop them anyway." Chavez argues that this statement established "that Swets' only purpose was to go on a fishing expedition of a non-Caucasian in an attempt to elicit incriminating evidence of a larger crime." Chavez argues that "nothing is more telling nor true, in this case than Swets' declaration prior to the stop."

[¶ 19.] Chavez's argument is taken out of content. It also ignores other evidence explaining why Swets made the statement. The record reflects that Swets originally followed Chavez's vehicle because it did not have a front license plate. When Swets saw the rear license plate, he realized that the car was from North Carolina, and he determined that North Carolina did not require a front license plate. However, Swets also noticed the "dangling object." Therefore, he decided (and made the statement) to stop the vehicle "anyway." Consequently, Swets articulated specific non-pretextual facts which, taken together with rational inferences from those facts, reasonably warranted the traffic stop. *Kenyon*, 2002 SD 111, ¶ 15, 651 N.W.2d at 273–274; *Barton*, 2001 SD 52, ¶ 16, 625 N.W.2d at 279. This type of traffic stop, based on a "dangling object," has been upheld on a number of occasions. *State v. Ashbrook*, 1998 SD 115, ¶ 13, 586 N.W.2d 503, 508; *State v. Ramirez*, 535 N.W.2d 847, 849 (S.D.1995); *State v. Krebs*, 504 N.W.2d 580, 585 (S.D.1993).

[¶ 20.] We finally note that because Swets was legally authorized to stop the vehicle, any additional "underlying intent or motivation" would not have invalidated the stop. *United States v. Bloomfield*, 40 F.3d 910, 915 (8thCir.1994) *cert. denied*, 514 U.S. 1113, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995); *United States v. Cummins*, 920 F.2d 498, 501 (8thCir.1990). Even if Swets had other motivations to stop Chavez, those subjective reasons were not relevant. They were not relevant because this stop was objectively reasonable, and an objectively reasonable stop is not invalidated even if the stop was pretextual. *State v. Lamont*, 2001 SD 92, ¶ 21, 631 N.W.2d 603, 610 (citing *Arkansas v. Sullivan*, 532 U.S. 769, 772, 121 S.Ct. 1876, 1878, 149 L.Ed.2d 994, 998 (2001)).

[¶ 21.] **1D. The drug dog alerted, which provided independent probable cause to search Chavez's vehicle.**

[¶ 22.] Although *the videotape does not display Chavez's vehicle,* he argues, as the federal district court concluded, that "the videotape as a whole *makes it clear* that Crockett did not alert during the first sniff of the vehicle and therefore any reliance on the dog to justify the search of Chavez's vehicle is without merit." (emphasis added). On the other hand, the state circuit court found that "the dog alerted to the vehicle thereby indicating the presence of illegal drugs." We first examine whether this state court finding of fact is clearly erroneous.

[¶ 23.] The circuit court heard considerable evidence supporting its finding. Moreover, a significant amount of that evidence was not available in the federal court hearings.[5] The evidence heard by the circuit court included Swets' sworn testimony that the dog alerted. Swets

---

**5.** See the evidence in note 2 *supra,* and note 7 *infra.*

testified that he "saw and heard [Crockett's] sniff intensify, increase, and his body posture tightened. He locked up on the trunk. He did not go any further." Although the videotape does not provide video confirmation [6] of this testimony, the alert was corroborated by three other witnesses who did not testify in the federal court proceedings.

[¶ 24.] The first additional witness was Kyle Heyen, the dog's trainer.[7] Heyen, a highly experienced dog trainer, described the behavior Crockett exhibited when he alerted to the odor of illegal drugs. He stated: "[h]is tail intensifies in its wagging and he gets an increase—very intense sucking in through his nose that—is very audible[.]" Although our untrained review of the audio portion of the videotape does not disclose an *obvious* "sucking sound," there is some audio evidence of dog sniffing. Moreover, Heyen testified that he had listened to the videotape of the stop at least a dozen times. He opined that the dog had alerted because he "heard the dog's increased breathing, which had not been present during whatever else he was doing around the vehicle .... his nose started inhaling, sucking in, and being a Hoover vacuum."

[¶ 25.] Trooper Thomas further corroborated an alert. He testified that he observed Crockett alert on "dozens" of occasions. He further testified that he observed Crockett during this sniff and observed that the dog "sniffed a little bit more, stiffened up, and then [Swets] gave him a

toy." The videotape confirms that Crockett returned from Chavez's vehicle with the toy in his mouth. According to Swets, "that's his praise or reward at the end of the search." Swets testified that he would not give Crockett the toy if the dog did not alert to the odor of illegal drugs in a real life search situation.

[¶ 26.] Finally, confirmation of an alert came from Deputy Sheriff Mike Schafer[8] and the fact that, shortly after the sniff, Swets stated to Meja–Castillo "[is] there any reason why my drug dog would alert to your vehicle today?" All of the foregoing evidence supports the trial court's finding that an alert occurred.

[¶ 27.] Chavez, however, argues that Swets' subsequent conversation with Deputy Schafer indicated that Crockett did not alert to the odor of an illegal substance. Chavez contends the conversation suggests that the officers searched the car based solely on the suspected false documents in Meja–Castillo's possession. In that conversation the officers stated:

> Swets: He's got falsified documents.
> Schafer: Yeah.
> Swets: That's a crime. We got probable cause for a search.
> Schafer: Yeah.
> Swets: I mean I think that, that's what I'm gonna go ahead with.

However, these statements when viewed in context are equivocal. The statement "I think that, that's what I'm gonna go ahead with," actually raises two possible infer-

---

6. A review of the videotape reveals no improper motive in the positioning of the video camera that was mounted inside Swets' vehicle. Because Chavez made a 90–degree turn immediately before stopping, Swets' vehicle and Chavez's vehicle were simply pointed in different directions.

7. Heyen presented extensive testimony at the state suppression hearing explaining how Crockett had been trained; how Crockett re-

acted to the odor of illegal drugs; how Crockett had passed his recertification in 2000 without problem; and, that he had listened to the tape of Chavez's arrest approximately a dozen times, and based on what he heard on the tape, it was his opinion that Crockett had in fact alerted to the odor of illegal drugs.

8. *See* note 9, *infra.*

ences. First, it could support the State's position that Swets had probable cause to *arrest* Meja–Castillo for false identification, also had probable cause (from the dog sniff) for a search, and was proceeding to search on the dog sniff. Or, it could imply that the probable cause to search only developed from the discovery of the falsified document.

[¶ 28.] While we only have a cold transcript and inconclusive videotape to resolve this dispute, the trial court heard live witness testimony including extensive cross-examination on this very issue. The trial court heard direct evidence of the officers' observations of an alert, defense counsel's cross-examination of Swets about the equivocal statement, and Swets' denial that the false document was the only source of probable cause for the search:

> Attorney: You agree that before the search started that in your discussion with Shafer and/or Thomas that you never articulated to them that your dog

had alerted as a probable cause for that search.

> Swets: I never directly stated that, sir.
>
> Attorney: In fact, it was a falsified social security card which was the only basis articulated in that discussion; correct?
>
> Swets: No, sir.

(After Swets denied that the suspected false document was the only justification for the search, defense counsel began asking questions on an unrelated topic.)

[¶ 29.] The trial court reviewed the tape, watched Swets testify, and listened to defense counsel's cross-examination and suppression arguments. The trial court ultimately judged four witnesses' credibility after listening to their live testimony. The trial court believed Swets, Thomas, Schafer and Heyen, and we do not conclude that its findings were clearly erroneous by second-guessing the trial court's credibility determinations.[9]

---

**9.** We should be loath to reverse a trial court's finding that it believed four live witnesses, especially in the absence of any direct evidence contradicting their testimony. The dissent would nevertheless do so solely by the use of a rhetorical question and "appellate inferences" that it draws from the record. The appropriate scope of appellate review should leave such inference making to the fact finder who actually observed those witnesses being cross-examined on the very inferences now drawn by the dissent. Under the appropriate scope of review, "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985). Our clearly erroneous review of this factual dispute makes it especially difficult to agree with the dissent's appellate inference that "it is *clear* that Trooper Swets did not believe the dog had alerted." ¶ 66, *infra.* (emphasis added).

Other inferences of fact drawn by the dissent also demonstrate the impropriety of appellate second-guessing the fact finder's credibility inferences on live witnesses. The first example is aptly demonstrated by the dissent's inference that Heyen proffered an "unsupportable" opinion that Crockett's breathing patterns changed sufficiently to signal an alert. It is suggested that Heyen's confirmation of an alert is unsupported because the videotape does not reveal an obvious sucking sound like a "Hoover vacuum." ¶ 67, *infra.* However, this criticism actually demonstrates the frailty of appellate second-guessing credibility determinations. It does so because the dissent's inference drawn from Heyen's opinion was specifically presented to the witness and the trial court. In fact, the videotape was played to the trial court while Heyen was required to identify the noises he relied upon to form his opinion. Heyen explained that he relied not only on the "sucking through the nose sound," but also upon: the dog's change in breathing; a lack of other "sniffing"; Swets' tap, whistle and other noise; Swets' use of the words "good boy"; and, the dog leaving with a toy. Although these facts are omitted from the dissent's analysis, they were presented to the trial court.

We therefore conclude that there was sufficient evidence in the record to support a finding that the drug dog alerted to the odor of an illegal substance.

[¶ 30.] Based on the trial court's finding of a drug alert, Swets had probable cause to search the vehicle. In *State v. De La Rosa*, 2003 SD 18, 657 N.W.2d 683, we upheld a vehicle search based on a drug dog alert even though the officer had no other reason to believe that drugs were present. Other courts agree. *See U.S. v. Sundby*, 186 F.3d 873, 875–876 (8thCir.1999) (A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable) (citing *United States v. Owens*, 167 F.3d 739, 749 (1stCir.1999); *See also United States v. Kennedy*, 131 F.3d 1371, 1376–77 (10thCir.1997), *cert. denied*, 525 U.S. 863, 119 S.Ct. 151, 142 L.Ed.2d 123 (1998); *United States v. Berry*, 90 F.3d 148, 153 (6thCir.1996); *United States v. Carrazco*, 91 F.3d 65, 67 (8thCir.1996); *United States v. Delaney*, 52 F.3d 182, 188 (8thCir.1995); *United States v. Lingenfelter*, 997 F.2d 632, 639 (9thCir.1993)).

[¶ 31.] Because Swets initiated a legal traffic stop, and because there is sufficient evidence in the record to support the trial court's finding that Crockett alerted to illegal drugs in the vehicle, the officers had probable cause to search. Because the officers had probable cause to search independent of any alleged incriminating statements made by Chavez and Meja–Castillo, we uphold the search.

[¶ 32.] **2. The trial court did not err in denying Chavez's motion to dismiss on the grounds of collateral estoppel, res judicata, and double jeopardy.**

[¶ 33.] Chavez argues that the state charges should have been dismissed under double jeopardy, res judicata, or collateral estoppel [10] analysis because of

---

Heyen was also able to answer other inferences rejected by the trial court, but adopted by the dissent. For example, Heyen was able to identify for the trial court, the distinction between Swets' breathing and the dog's breathing that the dissent finds missing. So also, Heyen explained to the trial court why Swets may not have orally emphasized an alert to all of the other officers.

Finally, it must be noted that Lawrence County Deputy Sheriff Michael Shafer provided evidence refuting the dissent's inference that Swets failed to tell anyone that the drug dog alerted. Deputy Shafer specifically testified that he arrived at the scene within minutes of the alert, and Swets immediately informed him upon his arrival that the dog had "showed interest," which Schafer understood to be an alert. Moreover, Shafer's confirmation of Swets' contemporaneous indication of an alert was corroborated by Shafer's written report prepared well before the issue of the alert surfaced in the federal proceedings. All of this evidence was considered by the trier of fact, and absent some direct evidence to the contrary, we should not second-guess that fact finder.

In the final analysis, it is significant that the trial court initially expressed extreme reluctance to reconsider the federal court findings. Nevertheless, it proceeded after being told it would hear different evidence. Moreover, the trial court had the benefit of live testing of the witnesses on the dissent's suggested inferences, but the trial court rejected them. It apparently did so because this record consists of the sworn testimony of four witnesses supporting an alert, with no contrary testimony. Under those circumstances, we are certainly not in a position to now make better inferences than the trial court, including a finding that four witnesses lied.

10. "The Double Jeopardy Clause of the Fifth Amendment declares that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb.' South Dakota's Constitution provides that 'No person shall . . : be twice put in jeopardy for the same offense.' SD Const Art VI, § 9." *State v.*

the federal prosecution and the federal court's determination that the search violated the Fourth Amendment. However, we rejected this argument in *State v. West*, 260 N.W.2d 215 (S.D.1977).

■■■■■■ [¶ 34.] With respect to double jeopardy, *West* held that when both state and federal courts have jurisdiction over a criminal act, the acquittal by one sovereign will not preclude a conviction by the other *absent a statute to the contrary. Id.* at 219. At the time *West* was decided, South Dakota had two statutes that prevented a prosecution in state court if the defendant had already been convicted or acquitted for the same criminal activity by another sovereign. However, immediately after the *West* decision, the South Dakota Legislature repealed those statutes.[11] Therefore, under our analysis in *West*, there are "no statutes to the contrary," and the principle of dual sovereignty [12] permits these successive prosecutions.

■■■■■■ [¶ 35.] Because double jeopardy does not bar successive prosecutions by dual sovereigns, we proceed to examine whether res judicata or collateral estoppel barred the state trial court from relitigating the suppression issues. In that regard, "it is clearly established that collateral estoppel and res judicata, although

applicable to successive prosecutions for the same criminal act by the same sovereign (*see Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970)), are not applicable to successive prosecutions by different sovereigns." *West*, 260 N.W.2d at 219. The rule is that as long as the initial prosecution is by a different sovereign, there is no reason "why the dual sovereignty doctrine should not leave states free to pursue prosecutions of their own criminal law unencumbered by either the 'same offense' or 'collateral estoppel' branches of federal double jeopardy jurisprudence." *State v. Shafranek*, 576 N.W.2d 115, 117 (1998). Other federal and state courts agree with this conclusion. *Id.*

[¶ 36.] A good example is *People v. Meredith*, 11 Cal.App.4th 1548, 15 Cal. Rptr.2d 285 (1992). There, a state trial court found that the initial stop of Meredith was reasonable and that he consented to a search of his luggage. Those findings were dramatically at variance with a federal district court's findings on the same factual issues. *Id.* at 289. Meredith argued that the federal court's findings constituted a final determination on the merits of the reasonableness of the search, and the state was barred by collateral estoppel

---

*Dillon*, 2001 SD 97, ¶ 13, 632 N.W.2d 37, 43. "The principle of criminal collateral estoppel is embodied in the double jeopardy clause of the [F]ifth [A]mendment[.]" *State v. Flittie*, 318 N.W.2d 346, 348 (S.D.1982).

11. SDCL 22–5–8 provided:
Whenever it appears that the accused has already been acquitted or convicted upon any criminal prosecution under the laws of another state, government, or country founded upon the act or omission in respect to which he is upon trial, this is a sufficient defense.
SDCL 23–2–13 provided in part:
When an act charged as a public offense is within the jurisdiction of another territory, state, or country as well as this state, a

conviction of [sic] acquittal thereof in the former is a bar to a prosecution therefor in this state.
*West*, 260 N.W.2d at 220.

12. Under the dual sovereignty doctrine "successive prosecutions by the state and federal governments do not constitute double jeopardy." *Turley v. Wyrick*, 554 F.2d 840, 841 (8thCir.1977). The dual sovereignty doctrine was recently reaffirmed in United *U.S. v. Johnson*, 169 F.3d 1092 (8thCir.1999) (stating that a subsequent prosecution by a separate sovereign does not violate the constitution). Courts have consistently upheld the dual sovereignty doctrine. *Id.*

from relitigating those issues. However, the California Court of Appeals held that the state was not collaterally estopped from relitigating the legality of a search.

[¶ 37.] The California court rejected the defendant's argument because "[a]n essential element for collateral estoppel [or res judicata] to apply is the requirement that the party sought to be bound by a prior determination must have been a party to the prior proceeding or in privity with a party." *Id.* at 291 (citing *Allen v. McCurry*, 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980)). Because "the People of the State of California were not a party to the federal proceeding and were not in privity with the United States, the party against whom the federal ruling was made," the relitigation was permitted. *Id.*

[¶ 38.] Chavez, however, asserts an exception to this rule, which was recognized in *Bartkus v. Illinois*, 359 U.S. 121, 122–124, 79 S.Ct. 676, 678, 3 L.Ed.2d 684, 686–687 (1959). Chavez argues that under the exception, "if one sovereign's prosecutors are merely a 'tool of a separate sovereign' or are a 'sham and cover' for another prosecution by the same sovereign, then the double jeopardy guarantee is implicated." Chavez contends that in this case, "the United State's Attorney worked closely with the state's agents throughout the federal prosecution." Chavez concludes that the state "was in privity with the federal government and must be bound by the federal court's decision to suppress all evidence in this matter."

[¶ 39.] Although some of the state law enforcement officers who made this stop testified in federal court, cooperation between state and federal law enforcement officers does not, by itself, affect the identity of the prosecuting sovereign. *Johnson*, 169 F.3d at 1096 (citing *Bartkus*, 359 U.S. at 123, 79 S.Ct. at 678, 3 L.Ed.2d at 687). *See also Meredith*, 15 Cal.Rptr.2d at 292 n.7 (citing *United States v. Davis*, 906 F.2d 829, 834 (2dCir.1990)). Stated another way, "[m]ere participation in a prosecution is not enough to establish privity." *Londono–Rivera v. Virginia*, 155 FSupp2d 551, 566 (D.Va.2001) (use of the same detective as witnesses in each prosecution does not create privity, where the detectives did not have the authority to act in the state's name or to decide how the prosecution would proceed); *Davis*, 906 F.2d at 834 (defendant must show *substantial* participation); *Stephens v. Attorney General of California*, 23 F.3d 248, 249 (9thCir.1994). So also, the fact that the state provided assistance to federal authorities in the gathering of evidence does not create an estoppel. *Shafranek*, 576 N.W.2d at 117. The critical factor is whether or not the state was acting independently. *Johnson*, 169 F.3d at 1096 (citing *Bartkus*, 359 U.S. at 124, 79 S.Ct. at 678, 3 L.Ed.2d at 686–687). The tool-of-the-same-authorities exception "may only be established by proof that the State officials had little or no independent volition in their proceedings." *Londono–Rivera*, 155 F.Supp.2d at 566 (quoting *In re Kunstler*, 914 F.2d 505, 517 (4thCir.1990)).

[¶ 40.] Therefore, Chavez's point that "the officers involved in the initial arrest and questioning of Chavez were state officials," is of little consequence. The record here reflects that the state officials instituted and controlled the state court prosecution, while federal officials instituted and controlled independent federal court proceedings. As the circuit court stated "there are no factors in this case which would lead me to believe, from what I've heard so far, that there was any privity between the State of South Dakota, the State's Attorney's office and the United States Government in the prosecution of this case." The trial court also found that, "the State of South Dakota made its own

independent decision to prosecute and had no control over the prosecution of the federal case." The trial court finally found that "[the State's Attorney] and his office obviously did not have any control over the prosecution of the federal case, nor did their office have any participation in the decision not to appeal the decision of the federal district court judge." Chavez has not established that these findings are clearly erroneous.

[¶ 41.] Chavez finally argues that we should defer to the federal court's suppression ruling based on the doctrine of comity. Comity is a well established principle in our case law. The party seeking relief under this doctrine must satisfy four conditions precedent:

1. The foreign court actually had jurisdiction over both the subject matter and the parties;

2. The decree was not obtained fraudulently;

3. The decree was rendered by a system of law reasonably assuring the requisites of an impartial administration of justice—due notice and a hearing; and

4. The judgment did not contravene the public policy of the jurisdiction in which it is relied upon.

*State v. Daly,* 454 N.W.2d 342, 344 (S.D. 1990).

[¶ 42.] Chavez is not entitled to comity under condition one because the State was not subject to the jurisdiction of the federal court in the prior proceeding. "It would of course be impossible for the federal prosecutor proceeding in a federal court to act as an agent for the State ... in the prosecution of crimes arising under the laws of this state. Neither the federal prosecutor nor the federal court would have authority to do that." *Shafranek,* 576 N.W.2d at 117. Because the federal court did not have jurisdiction over the State of South Dakota in the prior proceeding, comity is inapplicable.

[¶ 43.] For all of the foregoing reasons, we affirm.

[¶ 44.] GILBERTSON, Chief Justice, concurs.

[¶ 45.] KONENKAMP, Justice, concurs in result.

[¶ 46.] SABERS and MEIERHENRY, Justices, dissent.

KONENKAMP, Justice, concurring in result.

[¶ 47.] I agree with the conclusion of the Court, but arrive at it by different means. On some factual and legal points, I disagree with both the Court and the dissent on how this case should be resolved. Trooper Swets may not have acted or relied on his dog's "alert," but his subjective state of mind is not relevant to our inquiry. If the dog alerted and if Swets knew it alerted, he had probable cause to search, even if he expressed at the time some other legal justification to search. *State v. DeLaRosa,* 2003 SD 18, 657 N.W.2d 683 (drug dog alert is sufficient probable cause). On the other hand, if he did not know or believe that his dog alerted, then, regardless of whether the dog in fact alerted, Swets did not have probable cause.

[¶ 48.] Whether a Fourth Amendment violation occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting [the officer] at the time," and not on the officer's actual state of mind at the time the challenged action was taken. *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). We review two elements in probable cause determinations. First, we identify all rele-

vant facts known to the officer at the time of the search; and second, we decide, under a standard of objective reasonableness, whether those facts would give rise to a reasonable suspicion justifying probable cause to search. *Ornelas v. United States,* 517 U.S. 690, 696–697, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911 (1996). A search cannot be retrospectively transformed into an unlawful seizure by virtue of the officer's subjective intent. *Maryland v. Macon,* 472 U.S. 463, 471, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985).

[¶ 49.] Before we begin to examine this case, we must establish the legal reference point from which we view the trial court's decision. As explained in *State v. Lamont,* 2001 SD 92, ¶ 21, 631 N.W.2d 603, 610, it is essential in these cases to keep in mind that fact findings in suppression hearings are reviewed for clear error, but ultimately, in reviewing decisions on motions to suppress evidence taken in warrantless searches, our standard of review is de novo. *See State v. Morato,* 2000 SD 149, ¶ 10, 619 N.W.2d 655, 659 (citing *Ornelas,* 517 U.S. at 699, 116 S.Ct. at 1663, 134 L.Ed.2d at 920). It is our duty to make our own legal assessment of the evidence to decide under the Fourth Amendment whether the officer's actions were "objectively reasonable." *See Maryland v. Buie,* 494 U.S. 325, 330, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276 (1990). Consequently, we are not constrained by the trial judge's legal rationale for upholding the search. Equally important, we are not bound by a police officer's subjective rationale. *Arkansas v. Sullivan,* 532 U.S. 769, 771–72, 121 S.Ct. 1876, 1878, 149 L.Ed.2d 994 (2001); *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996).

### 1. Did Crockett alert?

[¶ 50.] This question is important, but not in the way that both the Court and the dissenters approach it. We need not decide whether the dog alerted based on how Trooper Swets reacted to the dog's behavior. That is a backward analysis, made unnecessary by the expert testimony. We know the dog alerted because there is uncontradicted expert opinion that he did. The circuit court accepted that opinion. If we apply the clearly erroneous standard of review to that finding, as we must, then we are bound by it, for there is evidence in the record to support it.

[¶ 51.] I realize that the federal district court found to the contrary. But that court did not have the benefit of hearing the State's expert. The federal court had to discern whether the dog alerted based on Trooper Swets's response to the dog. With only that evidence, I concede the answer is equivocal. But the State's expert on Crockett's behavior settled the issue. Kyle Heyen is familiar with Crockett: he trained him and he re-certified him. Heyen described Crockett's alert: "his tail intensifies in its wagging and he gets an increased—very intense sucking in through his nose that—it's very audible, and you can hear it." As the video tape was played for the circuit judge, Heyen pinpointed the exact time of Crockett's alert as heard on the tape: "his nose started inhaling, sucking in, being a Hoover vacuum." For the benefit of the circuit judge, Heyen himself indicated how this sounds. With Heyen's assistance, the circuit court was evidently able to hear it because the court specifically found that the dog alerted.

[¶ 52.] Although my personal viewing of the videotape is not dispositive on this point, in listening to it myself, at the point where Heyen stated that the dog alerted, I can hear increased sniffing, and some additional sounds, not inconsistent with the way Heyen described them. In declaring Heyen "not credible," the dissent wrests

from the trial judge a question that every appellate court in this land has said is ultimately a factual determination to be made by trial judges.

### 2. Did Trooper Swets "know" Crockett alerted?

[¶ 53.] This is a more difficult question. The answer is crucial, however, because probable cause must be based on the facts "known" to the officer at the time of the search. *Ornelas*, 517 U.S. at 696–97, 116 S.Ct. at 1661–62. We have both direct and circumstantial evidence to examine on this question. First, Trooper Swets testified that, although he never told his fellow officers, he nonetheless believed that Crockett had alerted to the trunk area of defendant's vehicle. He referred to the alert in his affidavit in support of a search warrant, signed the same day as the incident, and in his report of October 9, 2000. On the question whether Swets had knowledge that his dog alerted, the court simply found that the dog did alert and that thereafter Swets had probable cause to search.

[¶ 54.] The remainder of the evidence is circumstantial. And it is mixed, i.e., some of it supports his belief that the dog alerted, and some does not. Let us examine the supporting evidence. Swets gave Crockett a toy immediately after the alert on the trunk. The toy is Crockett's reward as Heyen explained:

> The toy is the reward for the dog, which is delivered or the dog retrieves upon conclusion of a search. The only purpose for that is to show the search is done. They've hunted; they've alerted; they've found. They've pinpointed; the exercise is done.

Does Crockett get a reward if he does not alert in a search? In the federal hearing, Swets confirmed that if he gives the dog the toy that means that he has seen an alert or an indication. The videotape shows the dog returning to the patrol car with a toy in his mouth. Immediately after putting the dog back in the patrol car, and making a radio call, Swets went over to defendant and asked him if he had any marijuana in the car or had used marijuana. Swets had asked defendant shortly after the stop if he had any marijuana or cocaine in the car and now asking him again after the sniff search could suggest that Swets felt there was reason to re-inquire. Also corroborating Swets's belief that the dog alerted is the fact that shortly afterwards he asked one of defendant's passengers "if there is any reason why my drug dog would alert to your vehicle today." Of course, that is essentially the same question he asked defendant before he took the dog to sniff around the car.

[¶ 55.] The evidence against Swets's knowledge that the dog alerted is significant. The dissent outlines this evidence and most of it need not be recited again here. Most troubling is the conversation between Swets and Deputy Shafer. Swets took Shafer aside, presumably to be out of the hearing of the defendant and his passengers, and suggested that the false identification gave them probable cause to search. Swets said, "Something is up." But he said not a word about Crockett alerting or even that he suspected that drugs were in the car.

[¶ 56.] These remarks are perplexing. But as for the comment Swets made to Shafer—"Crockett shows some interest, but"—I think there is an explanation. In listening to the tape, this remark was made in connection with the fact that Swets noticed that the passenger had a large amount of cash in his pocket. It was then that Swets remarked about Crockett showing interest. Significantly, Swets's report of October 9, 2000, written long

before the issue of whether the dog alerted, states:

> Deputy Shafer stated he felt the card was fraudulent. I informed Shafer the passenger had quite a bit of cash on [sic] his pocket and my dog showed some interest on the passengers [sic] side door seam.

This comment in the report is separate from the comment on the dog's alert: "I took my dog around the vehicle. He alerted to the odor of an illegal drug coming from the vehicle at the trunk seam."

[¶ 57.] The question is, from this contradictory evidence, was there sufficient evidence in the record to support the trial court's implicit finding that Swets knew his dog alerted and therefore had probable cause to search the vehicle based on that alert? Aside from the conflicting evidence from Trooper Swets, we have what the trial court considered as corroborative testimony. Here is where I part company with the Court and the trial judge most decidedly. The trial court placed reliance on the other two officers to corroborate Trooper Swets. A careful reading of the record fails to support the trial court's findings. First, there is the testimony of Trooper Thomas. He testified that the "the dog sniffed a little bit more, stiffened up, and then the officer gave him a toy." This corroborates Swets's testimony to the extent that it confirms that the dog's behavior changed at the trunk of the car. It does not establish that Swets knew the dog alerted, or, for that matter, that Thomas knew that the dog alerted.

[¶ 58.] Yet the trial court found that "Trooper Thomas witnessed Crockett *alert* to the presence of the odor of illegal drugs in the trunk area of the defendant's vehicle." How the court reached this finding is questionable. In response to the prosecutor's question, "what did the dog do?" Thomas volunteered the opinion that "he

appeared to alert on the vehicle." Defense counsel immediately objected to that remark because there was no foundation to establish that Thomas knew how to determine a drug dog alert. The trial court sustained the objection and later sustained another defense objection for the same reason. To use that answer, then, as the trial court did, was erroneous. After all, the judge had agreed that Thomas had not been qualified to give this opinion but it nonetheless used the opinion in its findings. Certainly, we should not rely on that opinion. But even if Thomas's opinion was properly considered, Thomas did not communicate his opinion to Swets. Thomas was there in a backup capacity. He did not prepare a report because he saw his role as purely secondary. It was Swets who decided to search the car; he was the trained drug dog officer; his knowledge was essential to create the basis for probable cause.

[¶ 59.] Even more doubtful, however, is the trial court's reliance on Deputy Shafer's testimony that Swets told him that the dog had alerted. First, Swets denied or did not recall that he told either Thomas or Shafer that his dog had alerted. Second, in explaining the way Swets had informed him, Shafer testified that he interpreted Swets's remark, "Crockett shows some interest . . . ." to mean that the dog alerted. But that was obviously a misinterpretation. Indeed, Swets confirmed for the trial court that "showing some interest" is not an alert. Thus, Shafer's testimony that Swets told him the dog alerted was a misinterpretation of what Swets said. The trial court was clearly erroneous in this finding.

[¶ 60.] The Court takes the view that because the circuit court believed Swets, we should defer to the trial judge's firsthand perception of credibility. It is true that we leave credibility decisions to the

trial court, unless we can say that its finding was clearly erroneous. However, the trial court's reliance on the "corroboration" from the other two officers is problematic. Now, after reviewing the videotape, I cannot ignore the witness of my own eyes. What I see causes me to doubt. I see no verbal indication in the videotape that Trooper Swets thought he was searching based on his dog's alert. To the contrary, his remarks seem to indicate that he was seeking to search on some other basis.

[¶ 61.] On the other hand, how much weight should we give to the indirect and passing remarks made by the officers as they went about their business? This is not a case like State v. Hanson, 243 Ga. App. 532, 532 S.E.2d 715 (Ga.App.2000), where a videotape showed that a Deputy Sheriff was not credible in contending that he smelled marijuana during a traffic stop. In that case, the Deputy commented outside the hearing of the driver, solely for purposes of the videotape, that the driver and his passenger appeared to be very nervous. He was using the videotape to make verbal notes of his observations during the traffic stop. But, tellingly, he made no remark, as an aside or otherwise, that he smelled the odor of marijuana. Id. at 533, 532 S.E.2d at 717. The trial court found: "The inclusion of an assertion in the officer's report that he smelled marijuana is not persuasive in light of the officer's obvious effort to inject relevant comments sotto voce, which convinces the Court the officer's testimony on that issue is not credible." Id. The appellate court agreed, concluding that credibility decisions are for the trial judge. Here, on the other hand, it is obvious from viewing the tape that the officers were not using the video recording to make "verbal notes" or to intentionally record their internal thought processes for the benefit of some future decision maker.

[¶ 62.] In the end, we have an expert opinion that the dog alerted, although this opinion does not retrospectively create probable cause at the time of the search. Probable cause must be formed on the information confronting the officers at the time, not as later revealed. State v. Meyer, 1998 SD 122, ¶ 23, 587 N.W.2d at 724 (citing State v. Heumiller, 317 N.W.2d 126, 129 (S.D.1982)). The State bears the burden of justifying a warrantless entry into a constitutionally protected area. Lamont, 2001 SD 92 at ¶ 22, 631 N.W.2d at 610. The trial court found that the State met its burden. I conclude, based on my own legal assessment of the evidence, that the videotape is inconclusive. All we have, then, is whether Trooper Swets is to be believed. Questions of witness credibility are reserved to the trial court, and we have no authority to substitute our judgment for that of the trial judge, unless we can say that the record clearly refutes it. Regardless of whether Trooper Swets communicated his knowledge of his dog's alert, if the dog alerted and if Swets knew it alerted, he had probable cause to search, even if he expressed some other legal justification to search. The trial judge believed him when Swets testified that he saw his dog alert. With only an inconclusive videotape to rebut Swets's testimony, the trial judge's credibility finding must stand. Therefore, I concur in result.

SABERS, Justice, dissenting.

[¶ 63.] I dissent on Issue 1D because the evidence as a whole indicates that the trial court erred in determining that the drug dog "alerted" on the vehicle of Chavez.

[¶ 64.] Unfortunately, the videotape of this stop, search and subsequent arrest does not capture the initial drug sweep by Trooper Swets and his dog, Crockett. However, the evidence that the tape does

reveal indicates that actions and comments by Trooper Swets fail to support his assertion that the dog alerted to the presence of drugs.

1. Despite the alleged "alert" by Crockett, Trooper Swets pursued his investigation regarding alien status for over twenty minutes before he commenced the search of the vehicle.

2. In discussing the possibility of searching the car, Trooper Swets stated, "[Aurelio's] got falsified documents. That's a crime. We got probable cause for a search. I think that's what I'm going to go ahead with." It is significant that Trooper Swets did not suggest Crockett's alleged alert as probable cause for a search.

3. Trooper Swets did not commence or even seem to become interested in conducting a search until after he became aware that INS was not interested in the suspects.

4. Although he testified that the dog alerted on the trunk of the car, Trooper Swets began his search with the sunroof because he believed it was "out of alignment."

5. After the search began, Trooper Swets said to Trooper Thomas, "[s]o we're not sure what we got, *if we got anything. Mike's pretty sure* there's dope here" (emphasis supplied). Once again, Trooper Swets gives no indication that his dog, Crockett, alerted to the presence of drugs in the vehicle. In fact, he does not even indicate that he personally believes there are drugs in the car.

6. The United States Federal District Court viewed the tape and determined that Crockett did not alert. At the state suppression hearing, the state presented additional evidence that it contends supports the finding that the dog did alert. However, that evidence has little value because the video and audio recording of the stop directly refutes it.

[¶ 65.] Trooper Swets' behavior after the dog allegedly alerted is inconsistent with his assertion that he performed the search based on the dog having alerted to the presence of drugs. Immediately after returning the dog to his patrol car, the trooper resumed his questioning regarding the alien status of the Defendant and his passengers. At that time, he also radioed dispatch with a request that INS be contacted.

[¶ 66.] At no time during the course of the stop did Trooper Swets inform the other officers that the dog had alerted in the initial search. Although Trooper Swets provided a possible justification for not sharing that information with the suspects, he offered no justification for withholding such information from his fellow investigating officers. Speaking with Officer Schafer, Trooper Swets stated, "Crockett shows some interest, but ..." The tone of his voice coupled with his actions and subsequent discussions with other officers makes it clear that Trooper Swets did not believe the dog had alerted.

[¶ 67.] The majority opinion relies heavily on the testimony of Kyle Heyen, a dog trainer, that he heard Crockett alert when he viewed the videotape. The testimony is not credible for two reasons:

1) In listening to the videotape, one can clearly hear the sound of Trooper Swets breathing as the "drug sniff" proceeds. The sound of Trooper Swets' breathing stops whenever he speaks to the dog. Heyen admitted on cross examination that he did not hear Trooper Swets breathing. If Heyen could not hear the trooper's audible breathing, the question be-

comes how could he have heard the dog alert?

2) Careful review of the video does not support Heyen's testimony at trial. He testified that when Crockett alerts "he gets increased—very intense sucking in through his nose that—It's very audible, and you can hear it." He also testified that he heard the dog on the videotape and that "[Crockett's] nose started inhaling, sucking in, being a Hoover vacuum." However, as the majority opinion notes at ¶ 24, there is no obvious sucking sound.

[¶ 68.] The evidence taken as a whole simply does not support the trial court's finding that the dog alerted to the presence of drugs in the vehicle. This Court should hold that the trial court clearly erred in this finding and proceed to determine whether Chavez's Miranda and other constitutional rights were violated by the questioning about his alienage in a traffic stop.

[¶ 69.] MEIERHENRY, Justice, joins this dissent.