#25164-a-GAS

**2010 SD 3**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

BARRY GLENN THUNDER,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JOSEPH NEILES
Judge

* * * *

MARTY J. JACKLEY
Attorney General

JOHN M. STROHMAN
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.

RYAN KOLBECK
Minnehaha County Public
 Defender's Office
Sioux Falls, South Dakota                    Attorneys for defendant
                                        and appellant.

* * * *

ARGUED NOVEMBER 17, 2009

OPINION FILED **01/06/10**

#25164

SEVERSON, Justice

[¶1.] Barry Glenn Thunder (Thunder) appeals his conviction of rape and possession and manufacture of child pornography. The sole issue is whether Officer Flogstad violated Thunder's right against unreasonable searches when he viewed, without consent, a warrant, or exigent circumstances, videos stored on a cell phone Thunder used. The circuit court denied Thunder's motion to suppress. We affirm.

## BACKGROUND

[¶2.] Thunder began living at 3520 North Eighth Avenue in Sioux Falls, South Dakota, in September 2007. Dean Wilson owned the home, but leased it to Harry Thunder (Harry), Thunder's father, and Darlene Peneaux (Darlene). Harry made the rent payments, and Darlene would contribute when necessary. Thunder did not contribute to the rent payments. The bedroom Thunder occupied was located in the northeast corner of the basement of the house. He had a bed, a television, and other personal items in this bedroom. A lock was on the door of the bedroom; however, no key to the lock existed. Thunder opened the lock using a wire hanger.

[¶3.] There were several other residents of the home. Sonny Thunder (Sonny), Harry and Darlene's son, also had a bedroom in the basement of the home. Darlene has a daughter from a previous relationship, Jessica Longcrow (Jessica). In February or March 2008, Jessica, Gervis Fool Bull (Gervis), and their two daughters moved into the home temporarily. The family resided in a third bedroom on the south side of the basement. Jessica, Gervis, and their two daughters moved out of the home on May 10, 2008.

[¶4.] Harry and Darlene had repeated problems with Thunder during the time he lived in their home. As a result, Harry and Darlene asked Thunder to leave

-1-

their home on several occasions. On May 24, 2008, Darlene asked Thunder to pack his things and move out. Thunder argued with Darlene, and she called the police. The police arrived at the home, went down to the basement, knocked on the door of the bedroom Thunder occupied, and escorted Thunder from the home. Following the advice of the police, Darlene locked the entrances and windows of the home. Dean Wilson, the owner of the residence, appeared with police officers the following morning. Several neighbors had informed Wilson that Thunder broke a basement window and entered the home during the night. After finding Thunder in the bedroom he had occupied, police arrested Thunder and again removed him from the home. Wilson insisted that Darlene and Harry remove Thunder's property from the home and ensure that he not be allowed on the premises.

[¶5.] On May 26, 2008, Harry and Darlene used a wire hanger to open the door on the bedroom Thunder had occupied. They intended to clean the room and remove Thunder's property. Harry or Darlene did not seek or receive Thunder's permission to enter the bedroom. Harry found a Qwest cell phone while cleaning the bedroom. Harry recognized the cell phone as one of three identical phones Darlene purchased in 2005 to be used by her, Jessica, and Sonny. The three had used these cell phones until the contract was terminated in 2006.* At some point, Thunder began using the cell phone as an alarm clock. The cell phone also had the ability to

---

\* Both Sonny and Jessica claimed ownership of the cell phone found in the bedroom Thunder occupied. They both testified they had not given the cell phone to Thunder and had not given him permission to use the cell phone for any purpose. However, Jessica was aware Thunder was using the cell phone, as she had seen it in the bedroom he occupied when she entered to retrieve things he had taken from her bedroom.

take and store pictures without being activated. After finding the cell phone, Harry activated it in Sonny's name, transferred Sonny's cell phone number to it, and gave it to Sonny.

[¶6.]        After Sonny received the cell phone, he began familiarizing himself with it. He soon discovered sixteen thumbnail images and opened two of the images to full screen view. Sonny observed one of Jessica's daughters in the pictures. In one picture, the girl appeared without pants or underclothing, thereby exposing her vaginal area. Another picture depicted a penis touching the vaginal area of the little girl. Sonny believed the pictures had been taken in the bedroom Thunder used. Sonny immediately notified Harry, Darlene, and Jessica.

[¶7.]        Jessica arrived home with her two daughters approximately one hour later. Sonny showed Jessica the pictures on the cell phone. After becoming physically ill, Jessica took her daughters to the Sanford Hospital emergency room to be examined. Upon realizing the police would need to see the pictures, Jessica called Sonny and asked him to bring the cell phone to the hospital. Jessica learned that during an argument among Harry, Darlene, and Sonny, Sonny deleted at least one picture from the cell phone. The other pictures were deleted by either Sonny or Harry. Nevertheless, Jessica directed Sonny and Darlene to bring the cell phone to the hospital. When Sonny arrived at the hospital, he gave the cell phone to Darlene who gave it to Jessica. While attempting to recover the pictures, Jessica began looking at the camcorder feature on the cell phone. She observed thumbnail images on the camcorder screen similar to the illicit pictures she saw earlier. She did not push "play" to view the videos.

[¶8.] Meanwhile, a nurse notified Officers Ryan Flogstad and Nick Cook, who were at Sanford Hospital investigating a separate matter, that a possible molestation case had presented to the hospital and asked them to investigate. The officers met with Jessica in a small interview room adjacent to the room where her daughters were being examined. As Jessica handed the cell phone to Officer Flogstad, she told him there were deleted pictures and videos of her daughters being molested on it. She described the deleted pictures and the thumbnail images signifying the videos. She told Officer Flogstad she believed Thunder placed the videos on the cell phone. She did not indicate to Officer Flogstad that she had watched the videos or who owned the cell phone. Officer Cook glimpsed the thumbnail images on the screen of the cell phone as Jessica handed it to Officer Flogstad. Officer Cook could see that the thumbnail images depicted child pornography. After receiving the cell phone from Jessica, Officer Flogstad watched each of the four videos.

[¶9.] Police initiated an investigation of Thunder. After viewing the cell phone videos, Officer Flogstad secured the bedroom Thunder had occupied at Harry and Darlene's home until a search warrant could be obtained. Officer Cook took possession of the cell phone and turned it over to Detectives McManus and Kooistra. Detective McManus viewed the videos and prepared an affidavit for a search warrant. A search warrant was granted. A search of the bedroom produced bed sheets, videotapes, and other evidence.

[¶10.] Thunder was indicted on June 5, 2008, for two counts of Rape in the First Degree (Victim Less Than Thirteen Years) and four counts of Possession, Manufacture, or Distribution of Child Pornography. Thunder pleaded not guilty to

all charges on June 10, 2008. Thunder later filed a motion to suppress the videos stored on the cell phone, alleging Officers Flogstad and Cook violated his right against unreasonable searches and seizures when they viewed the videos without consent, a warrant, or exigent circumstances. On September 15, 2008, the circuit court denied that motion. On October 28, 2008, one count of Rape in the First Degree (Victim Less Than Thirteen Years) was dismissed. The case proceeded to trial. On November 3, 2008, a jury returned a verdict of guilty on all counts, and the circuit court entered a judgment of conviction. Thunder appeals his conviction, alleging the circuit court erred in denying his motion to suppress.

## STANDARD OF REVIEW

[¶11.]     Our standard of review of motions to suppress is well settled. "A motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo." State v. Labine, 2007 SD 48, ¶12, 733 NW2d 265, 268 (quoting State v. Sweedland, 2006 SD 77, ¶12, 721 NW2d 409, 412 (citing State v. Chavez, 2003 SD 93, ¶13, 668 NW2d 89, 95)). The circuit court's factual findings are reviewed under the clearly erroneous standard of review. *Id.* "Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *Id.* ¶12, 733 NW2d at 269. This Court will not be restricted by the circuit court's legal rationale. State v. Christensen, 2003 SD 64, ¶7, 663 NW2d 691, 694 (citing State v. Lamont, 2001 SD 92, ¶21, 631 NW2d 603, 610).

## DECISION

[¶12.]     Thunder challenges Officer Flogstad's warrantless viewing of the videos stored on the cell phone he used under the Fourth Amendment to the United States

Constitution and Article VI, Section 11, of the South Dakota Constitution. He contends these provisions were implicated at the point Officer Flogstad pressed "play" to view the videos stored on the cell phone. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Similarly, Article VI, Section 11, of the South Dakota Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause supported by affidavit, particularly describing the place to be searched and the person or thing to be seized.

S.D. Const. art. VI, § 11. Thunder has not asserted, and we have not found, a basis to distinguish the protections afforded by the South Dakota Constitution from those provided by the federal Constitution under the circumstances of this case. Our analysis thus applies equally to both constitutional provisions. *See* State v. Deneui, 2009 SD 99, ¶12, 775 NW2d 221, 229.

[¶13.] Both provisions guarantee citizens protection from unreasonable searches and seizures by government actors. *Christensen*, 2003 SD 64, ¶11, 663 NW2d at 694 (citing U.S. Const. amend. IV; S.D. Const. art. VI, § 11). Police ordinarily must obtain a warrant based on probable cause and issued by a neutral magistrate before searching or seizing an individual's property. State v. DeLaRosa, 2003 SD 18, ¶7, 657 NW2d 683, 685 (citing Terry v. Ohio, 392 US 1, 20, 88 SCt 1868,

1879, 20 LEd2d 889, 905 (1968)). If a warrantless search or seizure is conducted, it is the State's burden to show the entry into the protected area was justified. *Christensen*, 2003 SD 64, ¶12, 663 NW2d at 695 (citing Vale v. Louisiana, 399 US 30, 34, 90 SCt 1969, 1972, 26 LEd2d 409 (1970); State v. Meyer, 1998 SD 122, ¶20, 587 NW2d 719, 723).

[¶14.]　　The Fourth Amendment guarantees no protection from private, nongovernmental searches. United States v. Jacobsen, 466 US 109, 113-14, 104 SCt 1652, 1656, 80 LEd2d 85 (1984); State v. Madsen, 2009 SD 5, ¶11, 760 NW2d 370, 374. However, private individuals may be considered agents of the State when they act on behalf of or cooperate with law enforcement officers. State v. Cundy, 86 SD 766, 771, 201 NW2d 236, 239 (1972). The Fourth Amendment does not apply to private searches even if the search was unauthorized or wrongful. *Jacobsen*, 466 US at 113-14, 104 SCt at 1656; *Madsen*, 2009 SD 5, ¶11, 760 NW2d at 374 (citing *Cundy*, 86 SD at 771, 201 NW2d at 239).

[¶15.]　　Officer Flogstad's viewing of the videos on the cell phone Thunder used is the first government action in this case. The Fourth Amendment is wholly inapplicable to the search of the bedroom and the cell phone by Thunder's family members. Harry, Sonny, and Jessica were not acting as agents of the government or with the participation or knowledge of any government official. *See Jacobsen*, 466 US at 113-14, 104 SCt at 1656; *Cundy*, 86 SD at 771, 201 NW2d at 239. Thunder argues Officer Flogstad conducted an unreasonable search of the videos stored on the cell phone he used in violation of his Fourth Amendment rights at the point Officer Flogstad pressed "play" to view the videos stored on the cell phone. While viewing

the videos stored on the cell phone was an action by a government official, it is not clear it implicated the protections of the Fourth Amendment.

[¶16.] "An individual must have a reasonable expectation of privacy in the place searched or the article seized before the Fourth Amendment will apply." *Christensen*, 2003 SD 64, ¶11, 663 NW2d at 694 (citing Katz v. United States, 389 US 347, 88 SCt 507, 19 LEd2d 576 (1967)). A two-part test determines whether an individual has a reasonable expectation of privacy in the area searched. Cordell v. Weber, 2003 SD 143, ¶12, 673 NW2d 49, 53 (citing State v. Lowther, 434 NW2d 747, 754 (SD 1989)). First, we consider whether the defendant exhibited an actual subjective expectation of privacy in the area searched. *Id.* Second, we consider whether society is prepared to recognize that expectation of privacy as reasonable. *Id.* Whether a person has a legitimate expectation of privacy in the place to be searched is determined on a "case-by-case basis, considering the facts of each particular situation." State v. Hess, 2004 SD 60, ¶17, 680 NW2d 314, 322 (citation omitted).

[¶17.] The United States Supreme Court has made clear that whether an individual is legitimately on the premises is "too broad a gauge for measurement of Fourth Amendment rights." Rakas v. Illinois, 439 US 128, 142, 99 SCt 421, 429, 58 LEd2d 387 (1978). Where an individual is legitimately on the premises, "the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the [Fourth] Amendment has a legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 SCt at 430 (citing *Katz*, 389 US at 353, 88 SCt at 512) (additional citations

omitted). *See* Minnesota v. Carter, 525 US 83, 119 SCt 469, 142 LEd2d 373 (1998); Minnesota v. Olson, 495 US 91, 110 SCt 1684, 109 LEd2d 85 (1990). Yet, the Court has been "quite careful to note that 'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search" under the Fourth Amendment. *Rakas*, 439 US at 141 n9, 99 SCt at 429 n9.

> A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence . . . is "wrongful"; his expectation is not "one that society is prepared to recognize as 'reasonable.'"

*Id*. at 143 n12, 99 SCt at 430 n12 (citing Jones v. United States, 362 US 257, 267, 80 SCt 725, 734, 4 LEd2d 697 (1960); *Katz*, 389 US at 361, 88 SCt at 516 (Harlan, J., concurring)).

[¶18.] Thunder argues he had a reasonable expectation of privacy in the cell phone because he kept it amongst his personal belongings in a locked bedroom. Thunder cannot claim a reasonable expectation of privacy in the cell phone on this basis. There is no indication Thunder sought or received permission from Darlene, Sonny, or Jessica to use the cell phone. Further, Thunder left the cell phone in the bedroom after Harry and Darlene ordered him to leave the home, and law enforcement forcibly removed him from the bedroom on two occasions. On the second occasion, Thunder had gained entry to the bedroom by breaking and crawling through a basement window. Indeed, at the time Officer Flogstad viewed the videos on the cell phone, Harry had activated the cell phone in Sonny's name, transferred Sonny's cell phone number to it, and given it to Sonny.

[¶19.] Thunder's claim that he had a reasonable expectation of privacy in the cell phone is defeated because his possession of the cell phone was wrongful. Thunder, like the "burglar plying his trade in a summer cabin during the off season," may have had a subjective expectation of privacy in the cell phone, but it is not "one which society is prepared to recognize as reasonable." *See id*. Therefore, Officer Flogstad's viewing of the videos stored on the cell phone claimed by the family members did not implicate the protections of the Fourth Amendment. The circuit court did not err in denying Thunder's motion to suppress.

[¶20.] Because we conclude Thunder did not have a reasonable expectation of privacy in the cell phone, we need not address whether any reasonable expectation of privacy Thunder might have claimed was frustrated by the private searches by his family members.

[¶21.] Affirmed.

[¶22.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.