#26232-a-DG

**2013 S.D. 3**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

ANDREW J. BONACKER,                       Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOSEPH NEILES
Judge

MARTY J. JACKLEY
Attorney General

KIRSTEN E. JASPER
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
                                          appellee.


NICOLE J. LAUGHLIN
MICHAEL G. MILLER
Minnehaha County Public Defender's Office
Sioux Falls, South Dakota                 Attorneys for defendant and
                                          appellant.

* * * *

ARGUED ON
OCTOBER 3, 2012
OPINION FILED **01/09/13**

GILBERTSON, Chief Justice

[¶1.]	Andrew Bonacker appeals his conviction for driving with a revoked driver's license.  We affirm.

## Facts and Procedural History

[¶2.]	At approximately 1:00 a.m. on April 3, 2010, South Dakota Highway Patrol Trooper Isaac Kurtz was traveling west on 60th Street North in the City of Sioux Falls when he noticed a vehicle traveling east approaching his patrol car with its headlights at what appeared to be their high-beam setting.  Kurtz later testified that the light was intense, forcing him to look to the side as the vehicle passed by.  Once the vehicle had passed, Kurtz turned his patrol car around and initiated a traffic stop of the other vehicle.

[¶3.]	Trooper Kurtz approached the driver's window of the stopped vehicle and explained the reason for the stop to the driver.  In response, the driver, later identified as Bonacker, stated that the lights were on their low-beam setting.  Further, Bonacker's front seat passenger, who identified herself as the owner of the vehicle, stated that she had previously had this problem.  Bonacker demonstrated the lights by flashing them against a nearby wall.  Following this demonstration, Kurtz commented, "O.K., they're really bright, huh?"  Kurtz then asked to see Bonacker's driver's license.  Bonacker informed Kurtz that he did not have a valid license and a subsequent check of the license revealed that it was revoked.  Bonacker was then arrested and taken into custody for driving with a revoked license.

[¶4.] Bonacker was indicted on May 20, 2010, for driving with a revoked license. Bonacker moved to suppress the evidence and statements obtained during the stop of his vehicle on the basis that, under the Fourth Amendment, the stop should have ended after Trooper Kurtz confirmed that he did not fail to dim his headlights. The magistrate court conducted a hearing on the motion to suppress and later entered findings of fact, conclusions of law, and an order denying the motion.

[¶5.] Bonacker's court trial was conducted in magistrate court on December 3, 2010. The magistrate court found Bonacker guilty and sentenced him to ninety days in the county jail with eighty-five days suspended and a fine of $200 plus costs. Bonacker appealed his conviction to circuit court arguing that the magistrate court erred in denying his motion to suppress. After briefing, the circuit court entered a memorandum decision along with findings of fact and conclusions of law affirming Bonacker's conviction, including the magistrate court's decision on Bonacker's motion to suppress evidence. Bonacker now appeals to this Court.

## Issue

[¶6.] **Whether Bonacker's federal and state constitutional rights were violated when he was detained by law enforcement after it was determined that there was no longer any articulable suspicion of criminal activity.**

[¶7.] Bonacker argues that Trooper Kurtz violated the prohibitions against unreasonable search and seizure in both the United States and South Dakota

Constitutions[1] by continuing to detain him and by requesting his driver's license after he demonstrated his headlights and Kurtz knew that no violation had occurred. Bonacker asserts that once Kurtz knew that no violation had occurred, his basis for detaining him dissipated and he should have been allowed to leave. Therefore, Bonacker contends Kurtz's request for his driver's license was an unconstitutional detention that took longer than necessary to effectuate the purpose of the stop and that it violated his rights under the federal and state constitutions. Bonacker submits that the evidence from the unlawful detention should have been suppressed and that, because it was not, his conviction must be reversed.

### *Standard of Review*

[¶8.]　　　This Court outlined the general standards of review applicable to motions to suppress evidence in a similar case in *State v. Overbey*:

> "This Court reviews the denial of a motion to suppress alleging a violation of a constitutionally protected right as a question of law by applying the de novo standard." *State v. Ludemann*, 2010 S.D. 9, ¶ 14, 778 N.W.2d 618, 622 (quoting *State v. Madsen*, 2009 S.D. 5, ¶ 11, 760 N.W.2d 370, 374). We review the trial court's findings of fact under the clearly erroneous standard and give no deference to its conclusions of law. *Id.* (citing *State v. Haar*, 2009 S.D. 79, ¶ 12, 772 N.W.2d 157, 162). As this Court has often noted,
>
>> this court's function under the clearly erroneous standard is to determine whether the decision of the lower court lacks the support of substantial evidence, evolves from an erroneous view of the applicable law or whether, considering the entire record, we are left with a definite and firm conviction that a mistake has been made. In making this determination, we review the evidence in a light most favorable to the trial court's decision.

---

1.　　*See* U.S. Const. amend. IV; S.D. Const. art. VI, § 11.

> *In re H.L.S.*, 2009 S.D. 92, ¶ 11, 774 N.W.2d 803, 807-08
> (quoting *State v. Baysinger*, 470 N.W.2d 840, 843 (S.D. 1991)
> (internal citations omitted)).

2010 S.D. 78, ¶ 11, 790 N.W.2d 35, 40.

## *Analysis*

[¶9.]    The Fourth Amendment generally requires a warrant based upon probable cause to support the search and seizure of a person. *Id.* ¶ 16, 790 N.W.2d at 41. There is an exception to the warrant requirement for investigative detentions based upon an officer's "reasonable suspicion" of criminal activity. *Id.* (citing *State v. DeLaRosa*, 2003 S.D. 18, ¶ 7, 657 N.W.2d 683, 686 (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884, 20 L. Ed. 2d 889 (1968))). Thus, an officer must have a "'specific and articulable suspicion of a violation'" of law to support a traffic stop and observation of a minor traffic violation is sufficient. *See Overbey*, 2010 S.D. 78, ¶ 16, 790 N.W.2d at 41 (citing *DeLaRosa*, 2003 S.D. 18, ¶ 8, 657 N.W.2d at 686 (citing *State v. Cuny*, 534 N.W.2d 52, 53 (S.D. 1995))). *In State v. Littlebrave*, this Court further noted that the constitutional reasonableness of an investigatory detention is judged under *Terry* and involves a two-part inquiry: "[f]irst, was the stop 'justified at its inception. . . . Second, were the officer's actions during the stop 'reasonably related in scope to the circumstances which justified the interference in the first place.'" 2009 S.D. 104, ¶ 11, 776 N.W.2d 85, 89 (quoting *Terry*, 392 U.S. at 19-20, 88 S. Ct. at 1878-79).

[¶10.]    As to whether the stop here was justified at inception, the trial court concluded that Trooper Kurtz clearly had a justifiable, objective reason for stopping Bonacker's vehicle because he believed its headlights were on a high-beam setting

in violation of South Dakota's motor vehicle laws. *See* SDCL 32-17-7 (making failure to dim headlights a Class 2 misdemeanor). *See also State v. Akuba*, 2004 S.D. 94, ¶ 15, 686 N.W.2d 406, 413 (quoting *State v. Chavez*, 2003 S.D. 93, ¶ 16, 668 N.W.2d 89, 95) (noting a traffic violation, however minor, creates sufficient cause to stop the driver of a vehicle). Bonacker does not challenge this determination. Rather, Bonacker challenges whether Kurtz's actions were reasonably related in scope to the circumstances justifying the stop in the first place. In that regard, Bonacker contests the trial court's conclusion that Kurtz lawfully requested his driver's license following the demonstration of the car's headlights. Bonacker argues that Kurtz should have let him go immediately after the demonstration because it established no headlight violation had occurred.

[¶11.]     In support of his argument, Bonacker relies on *State v. Hayen*, 2008 S.D. 41, 751 N.W.2d 306. In *Hayen*, a police officer stopped a new pickup truck because he was unable to see the expiration date on the bottom of its temporary thirty-day dealer's license which was properly displayed on the rear driver's side window of the vehicle. A box in the back of the pickup obstructed the bottom of the license and prevented the officer from seeing the expiration date before making the stop. After the stop, the officer approached the pickup on the driver's side and walked by the license without checking the expiration date which could be easily read at that point. Instead, the officer went directly to the driver's window and asked the driver for his driver's license and proof of insurance. Only after the driver provided these documents did the officer look at the expiration date on the dealer's license and find that it was valid. The officer then returned to his patrol car to run

a warrant and driver's license check which revealed an outstanding warrant for the driver. The officer arrested the driver and a subsequent search of his person and vehicle revealed methamphetamine residue and drug paraphernalia in the driver's coat pocket.

[¶12.] In a subsequent prosecution of the driver in *Hayen* for controlled substance violations, the driver moved to suppress the evidence gained from the search for violation of his federal and state constitutional rights against unreasonable searches and seizures. The trial court granted the motion to suppress and the State appealed. This Court affirmed, noting the following pertinent limitations on investigative detentions:

> "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the *least intrusive means* reasonably available to *verify or dispel* the officer's suspicion in a short period of time." *State v. Ballard*, 2000 S.D. 134, ¶ 11, 617 N.W.2d 837, 841 (emphasis added) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26, 75 L. Ed. 2d 229, 238 (1983) (citations omitted)). We also required that the investigation be "'reasonably related in scope to the circumstances that justified the interference in the first place.'" *Id.* (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (quoting *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968)))). We said additionally that after the completion of the traffic investigation "an officer must allow the driver to proceed without further constraint. . . ."

*Hayen*, 2008 S.D. 41, ¶ 7, 751 N.W.2d at 308-09 (emphasis original).

[¶13.] Based upon these limitations, we concluded in *Hayen* that the officer's request for the driver's license and proof of insurance exceeded the limits of a lawful investigative stop because the officer could have satisfied his suspicions by looking

at the dealer's license. Had he done so, it would have been clear that no violation had occurred or was occurring and that the officer's reason for detaining the driver had dissipated. Absent any further articulable suspicion of criminal activity, we held the officer's extended detention of the driver violated the driver's federal and state constitutional rights. Thus, we concluded the officer's request for the driver's license and proof of insurance was an unconstitutional detention and that the evidence garnered from that detention was properly suppressed.

[¶14.] Our holding in *Hayen* was premised upon *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994), a similar case from the Tenth Circuit Court of Appeals involving a temporary registration sticker. *McSwain* and *Hayen* are part of a class of cases collectively analyzed in 4 Wayne R. LaFave & David C. Baum, *Search and Seizure* § 9.3(c) n. 95 (4th ed. 2004) where it is noted:

> The importance of the violation of law to the authority to run a check on a license and registration is illustrated by those cases holding that if there is a stopping on either reasonable suspicion or probable cause of a traffic violation which is *determined immediately after the stop* not to have been a violation at all, the officer may not continue the detention for a license/registration check.

*Id.* (emphasis added).

[¶15.] A review of the cases cited in support of this point in LaFave, *supra*, reveals that almost all of them involve a stop for some sort of license plate violation where the objective information readily available to the officer *immediately* after the stop and before the officer even approached the driver dispelled, or should have dispelled, the reasonable suspicion of a violation of law that provided the basis for the stop. *See United States v. Wilkinson*, 633 F.3d 938 (10th Cir. 2011) (where the

vehicle was stopped because an officer saw its license plate tag unlawfully covered in plastic and it was argued the officer should have verified the validity of the tag and let the driver go); *United States v. Pena-Montes*, 589 F.3d 1048 (10th Cir. 2009) (where the vehicle was stopped for lack of a license plate, but, after pulling the vehicle over, the officer observed a dealer tag); *United States v. Jenkins*, 452 F.3d 207 (2d Cir. 2006) (where the vehicle was stopped for lack of a license plate, but on approaching the vehicle, the officer noticed a temporary plate on the rear of the vehicle); *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006) (where the vehicle was stopped because it had no rear license plate and the temporary registration tag could not be read, but as the officer approached the vehicle, he could see the tag); *McSwain*, 29 F.3d 558 (where the vehicle was stopped for an obstructed registration sticker, but, on approach, the officer saw the sticker was valid); *United States v. Horn*, 970 F.2d 728 (10th Cir. 1992) (where the vehicle was stopped for lack of a front license plate, but after the stop the trooper observed a rear plate from a state where no front plate was required); *People v. Redinger*, 906 P.2d 81 (Colo. 1995) (where the vehicle was stopped for lack of a license plate, but, while walking toward the vehicle, the officer observed a valid temporary registration plate); *State v. Diaz*, 850 So.2d 435 (Fla. 2003) (where the vehicle was stopped because the officer could not read its temporary tag, but, on approaching the vehicle, the officer could see the tag was valid); *State v. Chatton*, 463 N.E.2d 1237 (Ohio 1984) (where the vehicle was stopped for lack of a license plate, but, on approaching the vehicle, the officer observed a temporary tag visible through the rear windshield); *State v. Farley*, 775 P.2d 835 (Or. 1989) (where the vehicle was

stopped for lack of a license plate, but, when approaching the vehicle, the officer noticed a valid temporary permit posted on the windshield).

[¶16.] Even in those cases cited in LaFave, *supra*, where the stop did not involve a license plate violation, objective information readily available to the officer immediately after the stop quickly dispelled the reasonable suspicion of a violation of law that provided the basis for the stop. *See Holly v. State*, 918 N.E.2d 323 (Ind. 2009) (where the vehicle was stopped because a license plate check indicated the registered female owner had a suspended license, but on approaching the vehicle, the officer observed a male driver); *McGaughey v. State*, 37 P.3d 130 (Okla. Crim. App. 2001) (where the vehicle was stopped for having no operational taillights, but as the officer approached the vehicle he could see louvers over the taillights and that they were working). *See also City of Fairborn v. Orrick*, 550 N.E.2d 488 (Ohio Ct. App. 1988) (where a motorcycle was stopped because the passenger was not wearing protective eyegear, but the operator was wearing protective eyegear).

[¶17.] One circuit court has described the holding in *McSwain* and, by implication, those cases like it above, as "narrow." *United States v. Kirksey*, 485 F.3d 955, 957 (7th Cir. 2007). The Seventh Circuit has taken particular note that "*McSwain* involved a situation where the suspicion justifying the stop was *immediately dispelled* and so there was no need for any additional investigation." *Id*. (emphasis added). The Tenth Circuit has itself subsequently distinguished *McSwain* as involving a situation where the officer received a "clear refutation" of the suspicion justifying the stop. *Amundsen v. Jones*, 533 F.3d 1192, 1200 (10th Cir. 2008). In *Jenkins*, 452 F.3d at 213 n. 7, the Second Circuit specifically noted its

decision was premised on the assumption that the officers' initial reasonable suspicion was dissipated by the time they began to speak to the driver of the vehicle. State courts have also taken note of this factor. *See McGaughey*, 37 P.3d at 140 (noting the entire investigation of the basis for the stop was completed before the trooper ever interacted with the driver).

[¶18.]         This is not a case in that narrow category of cases described above where the investigating officer's reasonable suspicion was, or should have been, dissipated immediately after the stop or before ever approaching the driver. There was nothing during Trooper Kurtz's approach or even on his first contact with Bonacker that provided him with objective information immediately dispelling his reasonable suspicion. Kurtz observed what he reasonably suspected to be a failure to dim headlights. There could be nothing in his observations as he pulled up behind Bonacker's vehicle or approached it on foot that could confirm whether Bonacker had previously failed to dim his headlights or not. Thus, only his contact and interaction with Bonacker and further investigation of the matter could dispel his reasonable suspicion.[2]

---

2.      In this, we distinguish this case from *United States v. Bustillos-Munoz*, 235 F.3d 505 (10th Cir. 2000), where a trooper was followed and passed by a vehicle that he believed failed to dim its headlights. The trooper then maintained his observation of the vehicle as he pursued and stopped it. Thus, when the trooper approached the driver and the driver quickly activated his high beams, the trooper could tell immediately that they had not been in use and moved on to investigate the adjustment of the lights. Here, Trooper Kurtz had to turn his patrol car around and pursue Bonacker after observing the failure to dim. Therefore, Kurtz testified at trial that he could not tell whether Bonacker had changed his lights before stopping his

(...continued)

[¶19.]     This Court previously set forth the principles governing the scope of

investigative detentions in *Littlebrave*, 2009 S.D. 104, ¶ 12, 776 N.W.2d at 89-90:

> A lawful traffic stop may become unlawful "if it is prolonged
> beyond the time reasonably required to complete" its purpose.
> *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S. Ct. 834, 837, 160 L.
> Ed. 2d 842 (2005). "[A]n investigative detention must be
> temporary and last no longer than is necessary to effectuate the
> purpose of the stop. [Further], the investigative methods
> employed should be the least intrusive means reasonably
> available to verify or dispel the officer's suspicion in a short
> period of time." *State v. Ballard,* 2000 SD 134, ¶ 11, 617 N.W.2d
> 837, 841 (citing *Florida v. Royer,* 460 U.S. 491, 500, 103 S. Ct.
> 1319, 1325-26, 75 L. Ed. 2d 229, 238 (1983) (citations omitted)).
> However, "[a]n officer does not impermissibly expand the scope
> of a traffic stop by asking the driver questions, even if the
> subject of the questioning is unrelated to the original purpose of
> the stop, as long as the questioning does not unduly extend the
> duration of the initial, valid seizure." *State v. Akuba,* 2004 S.D.
> 94, ¶ 20, 686 N.W.2d 406, 415 (citing *United States v. Ramos,* 42
> F.3d 1160, 1165 (8th Cir. 1994) (Beam, J., concurring)); *United
> States v. Shabazz,* 993 F.2d 431, 437 (5th Cir.1993). Further, "a
> reasonable investigation of a traffic stop may include"
> questioning on "subjects like place of origination, destination,
> employment and the purpose of the trip." *Akuba,* 2004 S.D. 94, ¶
> 20, 686 N.W.2d at 415 (citing *Ramos,* 42 F.3d at 1161). *An
> "officer's request to examine a driver's license and vehicle
> registration or rental papers during a traffic stop and to run a
> computer check on both ... are [also] within the scope of
> investigation attendant to the traffic stop."* *United States v.
> Brigham,* 382 F.3d 500, 508 (5th Cir.2004) (citations omitted).
> These questions "may efficiently determine whether a traffic
> violation has taken place, and if so, whether a citation or
> warning should be issued or an arrest made." *Id.* For the same
> reasons, "an officer may undertake similar questioning of other
> vehicle occupants to verify information provided by the driver."
> *United States v. Foley,* 206 F.3d 802, 805 (8th Cir. 2000) (citation
> omitted). "If complications arise during these routine tasks, the
> vehicle may reasonably be detained 'for a longer duration than

_____

(…continued)

> vehicle or whether the lights were the same or different than when Kurtz
> first saw the vehicle.

when a stop is strictly routine.'" *United States v. Peralez,* 526 F.3d 1115, 1119 (8th Cir. 2008) (citing *United States v. Olivera–Mendez,* 484 F.3d 505, 510 (8th Cir.2007)).[3]

(Emphasis added). *Accord State v. Sound Sleeper*, 2010 S.D. 71, ¶ 19, 787 N.W.2d 787, 792.

[¶20.]     In carrying out his investigation here, Trooper Kurtz approached Bonacker's vehicle within forty-one seconds of having turned on his red lights. Kurtz immediately greeted Bonacker and explained he stopped his vehicle because Bonacker failed to dim his headlights. Bonacker indicated the lights were on their low-beam setting. His companion, the owner of the vehicle, volunteered that she had experienced problems in the past with other drivers flashing their headlights at her as a signal to dim her lights when they were already at their low-beam setting. At the same time, Bonacker demonstrated the lights' high- and low-beam settings by flashing them against a nearby building. At that point, approximately fifty-four seconds after the stop, Kurtz commented, "O.K., they're really bright huh?" Kurtz then asked Bonacker if he had his driver's license on him. Bonacker replied fifty-seven seconds after the stop that he did not have one. Thus, the entire duration of the stop from Kurtz's activation of his red lights to Bonacker's admission that he did not have a driver's license was less than one minute.

---

3.     We further noted in *Littlebrave* that, "'[c]omputerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means.'" 2009 S.D. 104, ¶ 14 n. 2, 776 N.W2d at 90 n. 2 (quoting *Brigham*, 382 F.3d at 511).

[¶21.] This brief detention reflects nothing but a routine traffic stop and request for a driver's license with only those questions, if they are even denominated such, necessary to follow up on the reason for the stop. The "questioning" did not amount to a minute in time and clearly did not "unconstitutionally prolong the detention 'beyond the time reasonably required to complete' its purpose." *Littlebrave*, 2009 S.D. 104, ¶ 14, 776 N.W.2d at 90 (quoting *Caballes,* 543 U.S. at 407, 125 S. Ct. at 837). Moreover, under the settled law of this Court as set forth above, the request for the driver's license was within the proper "'scope of the investigation attendant to the traffic stop.'" *Littlebrave*, 2009 S.D. 104, ¶ 12, 776 N.W.2d at 89 (quoting *Brigham,* 382 F.3d at 508). *See also United States v. Hollins*, 685 F.3d 703, 706-07 (8th Cir. 2012) (noting the Eighth Circuit has "consistently held that '[a] reasonable investigation following a justifiable traffic stop may include asking for the driver's license and registration.'" (quoting *United States v. Clayborn*, 339 F.3d 700, 702 (8th Cir. 2003) (quoting *United States v. Allegree*, 175 F.3d 648, 650 (8th Cir. 1999))). As recently explained by the Eighth Circuit Court of Appeals in *United States v. Roberts*: "Following a traffic stop, police officers may conduct 'a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning.'" 687 F.3d 1096, 1099 (8th Cir. 2012) (quoting *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010)).[4]

---

4. In this regard, we reject as an improper elevation of form over substance the

(…continued)

[¶22.]     Bonacker relies on Trooper Kurtz's later testimony during the suppression hearing and at trial that, by the time he requested Bonacker's driver's license, he was satisfied with Bonacker's explanation for the headlights and that he only asked for the license to check its validity.  Thus, Bonacker contends under the authorities previously cited that Kurtz should have let him go and not asked him for his license.  However, "[w]hether a Fourth Amendment violation occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting the officer at the time.'" *State v. Johnson*, 2011 S.D. 10, ¶ 5, 795 N.W.2d 924, 926 (quoting *State v. Chavez*, 2003 S.D. 93, ¶ 48, 668 N.W.2d 89, 102 (Konenkamp, J., concurring)).  "[W]e are not bound by a police officer's subjective rationale." *Littlebrave*, 2009 S.D. 104, ¶ 18, 776 N.W.2d at 92 (quoting *Chavez*, 2003 S.D. 93, ¶ 49, 668 N.W.2d at 103 (Konenkamp, J., concurring)).  In

_____

(…continued)

suggestion of Bonacker's counsel during oral argument that Trooper Kurtz should have requested the driver's license first, before any other statement or question, and that, had he done so, there would be no issue here.  As noted, this Court has stated the license check need not be pursued in a particular sequence during the investigation. *See Littlebrave*, 2009 S.D. 104, ¶ 14 n. 2, 776 N.W.2d at 90 n. 2.  While we have cautioned that the check may not be delayed "for the sole purpose of prolonging the detention so as to justify additional questioning," that did not occur here where the request for the license was promptly made in conjunction with the investigation. *Id.* Finally, this Court has previously indicated it will not take issue with an officer's manner of approaching a vehicle and that an officer, "must be able to use his judgment to determine the safest manner in which to approach a stopped vehicle" to "'exercise unquestioned command of the situation.'" *Sound Sleeper*, 2010 S.D. 71, ¶ 20, 787 N.W.2d at 792 (quoting *Brendlin v. California*, 551 U.S. 249, 258, 127 S. Ct. 2400, 2407, 168 L. Ed. 2d 132 (2007)).  Trooper Kurtz testified here that it was his usual practice to explain the reason for the stop at the outset to put the driver at ease as to the reason for the stop and license request and we find this testimony from a seven year veteran of the Highway Patrol to be both logical and persuasive.

this review, we look to the salient facts known to the officer at the time. *See Johnson*, 2011 S.D. 10, ¶¶ 8-12, 795 N.W.2d at 926-27. "It is our duty to make our own legal assessment of the evidence to decide under the Fourth Amendment whether the officer's actions were 'objectively reasonable.'" *Littlebrave*, 2009 S.D. 104, ¶ 18, 776 N.W.2d at 92 (quoting *Chavez*, 2003 S.D. 93, ¶ 49, 668 N.W.2d at 103 (Konenkamp, J., concurring)).

[¶23.]     Here, at the time he requested Bonacker's driver's license, Trooper Kurtz had seen what he believed was a failure to dim violation by Bonacker, had received an explanation for the violation from the occupants of the vehicle, had seen a brief demonstration of the headlights while standing beside the vehicle, and had made an ambiguous comment that the headlights were, "really bright huh?"[5] With those facts in hand, Bonacker's investigation might reasonably have followed any one of several possible paths forward: he might have completely disbelieved the tendered explanation and demonstration and issued a citation for the violation; he might have issued a warning ticket for the violation; he might have sought a more extensive demonstration of the headlights while looking directly at the front of the vehicle; or he might have accepted the explanation and demonstration already provided and allowed the vehicle to go on its way. Additionally, Kurtz might have investigated for a violation of SDCL 32-17-5 prohibiting headlights from projecting

---

5.    We cannot ascertain whether Kurtz's comment was referring to brightness at high-beam or low-beam or whether Kurtz was simply responding to the occupants' explanation of past problems with the vehicle's bright headlights.

a "glaring or dazzling light" and making that offense a Class 2 misdemeanor.[6] *See e.g. Bustillos-Munoz*, 235 F.3d 505, 513-14 (where after resolving a vehicle stop for failure to dim headlights the trooper proceeded to investigate the alignment of the headlights as regulated by a different statute and, during that investigation, requested the operator's driver's license). That Kurtz later testified and denied any intention to cite Bonacker for a violation of SDCL 32-17-5 makes no difference. *See State v. Vento*, 1999 S.D. 158, 604 N.W.2d 468 (upholding on objective grounds an investigative detention and request for a driver's license for violation of a statute governing display of license plates where the arresting officer testified that he believed the license plate was properly displayed).[7] Again, we are not governed by

---

6.  Although Bonacker was stopped for a violation of SDCL 32-17-7 making failure to dim headlights a Class 2 misdemeanor, SDCL 32-17-5 regulates the adjustment and brightness of headlights and prohibits them from projecting, "a glaring or dazzling light to persons in front of such [headlights]." Violation of this provision is also a Class 2 misdemeanor. *Id.*

7.  In *Vento*, an officer stopped a vehicle for failure to display a front license plate. After the stop, the officer saw the license plate lying flat in the front windshield on the passenger side of the vehicle. Nevertheless, the officer asked the driver for his driver's license, learned it was revoked, and arrested the driver for driving under revocation. During the ensuing prosecution, the trial court granted a motion to suppress the evidence obtained after the officer saw the license plate because his reasonable suspicion dissipated at that point. The State appealed and this Court reversed, holding that despite testimony from the officer conveying his subjective belief that the license plate had been properly displayed, the officer was "objectively justified" in continuing to detain the driver after seeing the plate displayed in a manner that *was* in violation of the statute. *Vento*, 1999 S.D. 158, ¶ 11, 604 N.W.2d at 470. As authority for our position in *Vento*, we relied primarily on *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89, 98 (1996) holding that, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."

the officer's subjective rationale. *See Littlebrave*, 2009 S.D. 104, ¶ 18, 776 N.W.2d at 92.

[¶24.] Finally, even if Kurtz was subjectively satisfied with the occupants' explanation and the demonstration of Bonacker's headlights, he never conveyed that satisfaction beyond his ambiguous comment that, "they're really bright huh?" Certainly he never conveyed to Bonacker at any time prior to requesting his driver's license that the investigation was complete and that Bonacker was free to leave. If he had, we might well be confronted with a different situation here. *See, e.g., Ballard*, 2000 S.D. 134, 617 N.W.2d 837 (holding an officer's continued detention of a driver for use of a drug dog after the officer's issuance of a warning citation and advisement to the driver that she was "free to leave" was impermissible under the Fourth Amendment).[8] *See also Roberts*, 687 F.3d at 1099 (noting that, "once the officer decides to let a routine traffic offender depart with a ticket, a warning or an all clear – a point in time determined, like other Fourth Amendment inquiries, by

_____

8.  *Ballard* was premised upon *State v. Durke*, 1999 S.D. 39, 593 N.W.2d 407. During oral argument, there was a suggestion that affirmance of the conviction here would necessitate abrogation or modification of *Durke*. That is not the case. In *Durke*, a trooper stopped a group of seven motorcyclists because, under South Dakota law, the handlebars were too high on four of the motorcycles. Although the motorcyclists were told they could leave once their motorcycles were in compliance with South Dakota law, it was not made clear to the three cyclists whose motorcycles were already in compliance that they were free to go. Instead, they remained on the scene and were subjected to a group search that resulted in their prosecution for various controlled substance and concealed weapon offenses. We ultimately affirmed the trial court's suppression of evidence related to the three cyclists, holding they were detained after the purpose of the investigatory stop had ended as to them. That is not the case here where Trooper Kurtz had not yet completed the purpose of the investigatory stop when Bonacker admitted he had no driver's license.

objective indicia of the officer's intent – then the Fourth Amendment applies to limit any subsequent detention or search." (quoting *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 648 (8th Cir. 1999))).

**Conclusion**

[¶25.] We hold that when Trooper Kurtz requested Bonacker's driver's license, Kurtz had not yet completed his investigation of the failure to dim offense and, therefore, his request for the license was within the scope of the investigation attendant to the traffic stop. *Littlebrave*, 2009 S.D. 104, ¶ 12, 776 N.W.2d at 89. Bonacker's admission at that point that he did not have a driver's license provided reasonable suspicion that he was driving without a valid license. *See Sound Sleeper*, 2010 S.D. 71, ¶ 25, 787 N.W.2d at 794. This provided additional reasonable suspicion to further extend the investigation in order to resolve the issue over the status of Bonacker's license. *See Littlebrave*, 2009 S.D. 104, ¶ 16, 776 N.W.2d at 91. Thus, "further reasonable suspicion, supported by articulable facts, emerged" during the stop "making the duration of [the] stop reasonable." *Id.* (quoting *Brigham*, 382 F.3d at 507).

[¶26.] Based upon the foregoing, we find no violation of Bonacker's federal or state constitutional rights against unreasonable searches and seizures. Accordingly, suppression of the evidence seized during the stop of Bonacker's vehicle was unwarranted and there was no error by the circuit court or magistrate court in their rulings in this regard.

[¶27.] Affirmed.

[¶28.] ZINTER, SEVERSON, and WILBUR, Justices, concur.

[¶29.]        KONENKAMP, Justice, concurs in result.


KONENKAMP, Justice (concurring in result).

[¶30.]        I concur with the Court's holding that Trooper Kurtz was entitled to ask Bonacker for his driver's license, even after the trooper learned from Bonacker that the original reason for stopping the car was mistaken. To investigate the headlight violation, the trooper first had to talk with the driver. It should make no difference if during the stop the trooper had inquired about the headlights either before or after asking to see Bonacker's driver's license. As the Court points out, during a lawful stop, within a reasonable time, investigating officers are not required to carry out their procedures in any particular order. To require otherwise would transform investigative stops into roadside rituals.

[¶31.]        Where I differ with the Court is in its speculation about what the trooper could have done, might have believed, and may have investigated. Our function restricts us to determining whether a challenged seizure fell within constitutional and statutory limits. We should abstain from deciding the propriety of law enforcement actions not before us. Producing a driver's license is a routine part of any traffic stop, and drivers are required by law to have it in their possession and display it on "demand of a . . . peace officer." SDCL 32-12-39. It is enough, therefore, to declare that the trooper's timely request to see a driver's license was within the scope of a lawful stop and "'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *See Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229 (1983) (quoting *Terry v.*

*Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 1877, 20 L. Ed. 2d 889 (1968)) (additional

citation omitted).